NO. 15-30538

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,
                    Plaintiff - Appellee Cross-Appellant

v.

JERMAINE J. CHAPMAN, also known as Dump Truck,
CHARLES BOYER, also known as Slim,
                    Defendants - Appellants
JEFFERY D. PERRY,
                    Defendant - Appellant Cross-Appellee

Appeal from the United States District Court
for the Middle District of Louisiana
Criminal No. 3:13-CR-57

BRIEF OF THE UNITED STATES

J. WALTER GREEN
United States Attorney
Middle District of Louisiana

M. PATRICIA JONES
ROBERT W. PIEDRAHITA
Assistant United States Attorneys
777 Florida Street, Suite 208
Baton Rouge, LA 70801
Telephone: 225-389-0443

# <u>STATEMENT REGARDING ORAL ARGUMENT</u>

There is no need for oral argument in this case.  Although the record is voluminous, the issues and relevant facts are adequately discussed in the briefs.

# TABLE OF CONTENTS

**PAGE NO.**

STATEMENT REGARDING ORAL ARGUMENT ....................................i

TABLE OF CONTENTS ........................................................................ii

TABLE OF AUTHORITIES...................................................................vi

STATEMENT OF JURISDICTION........................................................ 1

STATEMENT OF ISSUES PRESENTED................................................ 3

STATEMENT OF THE CASE ................................................................ 5

    I.    The Offense Conduct............................................................. 6

        A.    Drug Dealing at The Hole and The Gate...................... 6

        B.    Investigatory Stop of Perry Near
            Baton Rouge High ........................................................ 7

        C.    The Click House at 221 Evergreen Street..................... 8

        D.    Search of 253 Delphine Street .................................... 10

        E.    Three Kilogram Sale to William Johnson ................... 12

        F.    Attempted Purchase from "Miami" ............................ 13

        G.    Robbery of the Chinese Man........................................ 14

        H.    Carjacking of William Johnson.................................... 16

        I.    The Arming of Mark Allen........................................... 18

        J.    The Click House at 321 Delphine ................................ 18

K.   Cash Seizure on Interstate 10 ...................................... 19

L.   Searches of the Evergreen Click House........................ 20

M.   Seizure of Cash from Hidden Compartment
     in White Honda .......................................................... 21

N.   The Click House at 2402 Louisiana Avenue ............... 22

O.   Discarding of Gun During High Speed Chase............ 23

P.   Distribution to Darnell Dalton ................................... 24

Q.   Controlled Buys by Robie Knight ............................... 24

R.   Arrest of Jonathan Perry ............................................ 25

S.   Trips to Houston ......................................................... 25

II.  Proceedings in the District Court........................................ 27

A.   The Charges ................................................................ 27

B.   Boyer's Motion to Sever ............................................. 30

C.   The Trial...................................................................... 31

D.   Post-Trial Motions ...................................................... 34

     1.   Boyer's Motion for Judgment of Acquittal
          or New Trial ....................................................... 34

     2.   Motions by Perry and Chapman for New
          Trial Based on Newly Discovered
          Evidence ............................................................. 35

E.   Sentencing................................................................... 38

iii

SUMMARY OF THE ARGUMENT ........................................................ 41

ARGUMENT ........................................................................................ 45

MAIN APPEAL

I.    The United States presented more than sufficient
      evidence that Perry conspired with others to
      possess and distribute crack and cocaine and that
      Boyer intentionally participated in that
      conspiracy. ............................................................................ 45

      A.    Standard of Review ..................................................... 45

      B.    The Elements of Conspiracy ...................................... 47

      C.    Discussion..................................................................... 49

            1.    Perry................................................................ 49

            2.    Boyer  .............................................................. 55

II.   The district court did not abuse its discretion in
      declining to grant Boyer a separate trial from his
      co-conspirators, and Boyer has not demonstrated
      that he was prejudiced by the joint trial.. ........................... 58

      A.    Standard of Review ..................................................... 58

      B.    Law Regarding Joint Trials ........................................ 59

      C.    Discussion..................................................................... 61

III.  The district court did not abuse its discretion in
      denying the motions for new trial filed by
      Chapman and Boyer ............................................................. 62

      A.    Standard of Review ..................................................... 62

iv

B.  Rule 33.........................................................................63

C.  Discussion...................................................................65

    1.  Boyer. ...............................................................65

    2.  Chapman. ........................................................67

CROSS-APPEAL

IV.  The district court erred when it failed to impose the
     mandatory enhanced penalty for either of Perry's
     convictions for violating 18 U.S.C. § 924(c). .........................77

     A.  Standard of Review .....................................................77

     B.  Enhanced Penalties Under Section 924(c) ..................77

     C.  Discussion...................................................................79

CONCLUSION ........................................................................82

CERTIFICATE OF SERVICE.................................................83

CERTIFICATE OF COMPLIANCE.........................................84

# TABLE OF AUTHORITIES

## Cases

Bruton v. United States, 391 U.S. 123 (1968) ........................................ 59

Deal v. United States, 508 U.S. 129 (1993) .................... 39, 40, 78, 79, 81

Ocasio v. United States, 136 S.Ct. 1423 (2016) .................... 47, 48, 57, 58

Salinas v. United States, 522 U.S. 52 (1997).................................... 48, 66

United States v. Barnes, 803 F.3d 209 (5th Cir. 2015) .......................... 46

United States v. Beacham, 774 F.3d 267 (5th Cir. 2014)....................... 47

United States v. Bermea, 30 F.3d 1539 (5th Cir. 1994) ......................... 46

United States v. Bieganowski, 313 F.3d 264 (5th Cir. 2002) ................. 60

United States v. Bowen, 799 F.3d 336 (5th Cir. 2015)........................... 64

United States v. Bowen, 818 F.3d 179 (5th Cir. 2016)..................... 45, 46

United States v. Brewer, 60 F.3d 1142 (5th Cir. 1995)......................... 76

United States v. Brown, 727 F.3d 329 (5th Cir. 2013) ..................... 48, 66

United States v. Cannon, 750 F.3d 492 (5th Cir. 2014) ........................ 46

United States v. Cardenas, 9 F.3d 1139 (5th Cir. 1993) ....................... 49

United States v. Causey, No. 11-31106, 568 Fed.Appx. 269
(5th Cir. May 13, 2014) (unpublished).................................................. 68

United States v. Ceballos-Torres, 218 F.3d 409 (5th Cir. 2000) ...... 71, 75

United States v. Chacon, 742 F.3d 219 (5th Cir. 2014)..........................68

United States v. Charles, 469 F.3d 402 (5th Cir. 2006) ........................75

United States v. Crain, 33 F.3d 480 (5th Cir. 1994) .............................57

United States v. Davis, 752 F.2d 963 (5th Cir. 1985)............................46

United States v. Delgado, 672 F.3d 320 (5th Cir. 2012) (en banc).........48

United States v. Ellender, 947 F.2d 748 (5th Cir. 1991).................59, 61

United States v. Garcia, 567 F.3d 721 (5th Cir. 2009) ....................45, 57

United States v. Gonzalez, 163 F.3d 255 (5th Cir. 1998) .......................70

United States v. Greenwood, 974 F.2d 1449 (5th Cir. 1992)............46, 51

United States v. Holmes, 406 F.3d 337 (5th Cir. 2005)....................48, 66

United States v. Kaluza, 780 F.3d 647 (5th Cir. 2015) ....................77, 80

United States v. Krenning, 93 F.3d 1257 (5th Cir. 1996) ................49, 74

United States v. Mahmood, 820 F.3d 177, (5th Cir. 2016)...............63, 65

United States v. Major, 676 F.3d 803 (9th Cir. 2012) .....................80, 81

United States v. McKnight, 953 F.2d 898 (5th Cir. 1992).....................70

United States v. McRae, 702 F.3d 806 (5th Cir. 2012)...........................58

United States v. Misher, 99 F.3d 664 (5th Cir. 1996) ...........................74

United States v. Morris, 46 F.3d 410 (5th Cir. 1995).............................57

United States v. Mulderig, 120 F.3d 534 (5th Cir. 1997)................45, 47

United States v. Munoz, 150 F.3d 401 (5th Cir. 1998)...........................64

United States v. O'Keefe, 128 F.3d 885 (5th Cir. 1997) ........................64

United States v. Pierce, 785 F.3d 832 (2d Cir. 2015) ...........................81

United States v. Pinkerton, 328 U.S. 640
(1946) ......................................................33, 36, 37, 38, 39, 49, 71, 72, 73

United States v. Pofahl, 990 F.2d 1456 (5th Cir. 1993) ........................59

United States v. Powell, 469 U.S. 57 (1984)..........................................56

United States v. Pratt, 807 F.3d 641 (5th Cir. 2015) ............................63

United States v. Reagan, 596 F.3d 251 (5th Cir. 2010).........................49

United States v. Reagan, 725 F.3d 471 (5th Cir. 2013).........................62

United States v. Robertson, 110 F.3d 1113 (5th Cir. 1997) ....... 46, 63, 64

United States v. Sacerio, 952 F.2d 860 (5th Cir. 1992).........................49

United States v. Sepulveda, 710 F.2d 188 (5th Cir. 1983)....................62

United States v. Shoemaker, 746 F.3d 614 (5th Cir. 2014) ...................47

United States v. Simpson, 741 F.3d 539 (5th Cir. 2014)........................56

United States v. Snarr, 704 F.3d 368 (5th Cir. 2013) ............... 58, 59, 60

United States v. Stalnaker, 571 F.3d 428 (5th Cir. 2009)......................61

United States v. Stoker, 706 F.3d 643 (5th Cir. 2013) ..........................48

United States v. Tarango, 396 F.3d 666 (5th Cir. 2005) ................. 58, 63

United States v. Valdez, 453 F.3d 252 (5th Cir. 2006)..........................59

United States v. Walker,___ F.3d ___, 2016 WL 3648323
(5th Cir. 2016) .................................................................... 75

United States v. Wall, 389 F.3d 457 (5th Cir. 2004) ........... 63, 64, 65, 70

United States v. Washington, 714 F.3d 962 (6th Cir. 2013) ................. 81

United States v. White, 219 F.3d 442 (5th Cir. 2000) ........................... 47

United States v. Whitfield, 590 F.3d 325 (5th Cir. 2009)................ 58, 60

United States v. Wise, 221 F.3d 140 (5th Cir. 2000) ....................... 45, 55

Zafiro v. United States, 506 U.S. 534 (1993) ................................... 59, 60

## Statutes

18 U.S.C. § 922(g)(1).................................................................... 28, 29

18 U.S.C. § 924(c) .............................. 4, 6, 39, 40, 44, 67, 77, 78, 79, 80, 81

18 U.S.C. § 924(c)(1) (1990)................................................................. 78

18 U.S.C. § 924(c)(1)(A) .............................................................. 27, 29

18 U.S.C. § 924(c)(1)(A)(i)................................................................... 77

18 U.S.C. § 924(c)(1)(A)(ii) ................................................................. 77

18 U.S.C. § 924(c)(1)(A)(iii) .......................................................... 28, 77

18 U.S.C. § 924(c)(1)(C)(i).................................................................. 78

18 U.S.C. § 924(c)(1)(D)(2)................................................................. 78

18 U.S.C. § 2119 ................................................................................. 28

18 U.S.C. § 3231 ....................................................................................1

18 U.S.C. § 3742(b) ..............................................................................1

18 U.S.C. § 3742(b)(1) ..........................................................................1

21 U.S.C. § 841(a)(1) ........................................................ 27, 28, 29, 30

21 U.S.C. § 846 ............................................................................. 27, 47

28 U.S.C. § 1291 ...................................................................................1

## Rules

Fed. R. App. P. 4(b)(1)(A)(i) ..........................................................1, 2

Fed. R. App. P. 4(b)(1)(B)(i) ...............................................................1

Fed. R. App. P. 4(b)(2) .....................................................................1, 2

Fed. R. App. P. 28(a)(8)(A) ...............................................................49

Fed. R. App. P. 32(a)(5) ....................................................................84

Fed. R. App. P. 32(a)(6) ....................................................................84

Fed. R. App. P. 32(a)(7)(B) ...............................................................84

Fed. R. Crim. P. 14 ...........................................................................60

Fed. R. Crim. P. 25(a)(2) ..................................................................32

Fed. R. Crim. P. 29 ...........................................................................34

Fed. R. Crim. P. 33 ...........................................................................34

## STATEMENT OF JURISDICTION

Jeffery D. Perry, Jermaine J. Chapman, and Charles Boyer were convicted by a jury of participating in a drug conspiracy; Perry and Chapman were also convicted of numerous related offenses. The district court had subject matter jurisdiction over the case pursuant to 18 U.S.C. § 3231.

Perry, Chapman, and Boyer appeal their convictions on several grounds, and the United States cross-appeals Perry's sentence. This Court has jurisdiction over the defendants' appeals pursuant to 28 U.S.C. § 1291 and over the Government's cross-appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(b)(1).

Perry was sentenced on August 19, 2015. The district court's judgment as to Perry was entered on August 28, 2015. Perry's notice of appeal was timely filed on August 25, 2015. <u>See</u> Fed. R. App. P. 4(b)(1)(A)(i), 4(b)(2). The Government's notice of cross-appeal was timely filed on September 22, 2015. <u>See</u> Fed. R. App. P. 4(b)(1)(B)(i). On January 4, 2016, the Solicitor General of the United States personally approved prosecution of the cross-appeal. <u>See</u> 18 U.S.C. § 3742(b).

1

Chapman was sentenced on June 16, 2015, and the district court's judgment as to Chapman was entered on June 24, 2015. Chapman's notice of appeal was timely filed on June 22, 2015. <u>See</u> Fed. R. App. P. 4(b)(1)(A)(i), 4(b)(2).

Boyer was sentenced on June 18, 2015. The district court's judgment as to Boyer was entered on June 22, 2015, and an amended judgment was entered the next day. Boyer's notice of appeal was timely filed on June 23, 2015. <u>See</u> Fed. R. App. P. 4(b)(1)(A)(i).

## STATEMENT OF ISSUES PRESENTED

**MAIN APPEAL**

1.    Was there sufficient evidence to convict Perry, an admitted drug dealer, of conspiracy, where six cooperators testified that numerous individuals assisted Perry in his drug operation and where other evidence corroborated the cooperators' accounts?

2.    Was the evidence of Boyer's role in Perry's drug operation, including testimony that Boyer retrieved drugs, weighed and bagged drugs, handled customers, and protected the drugs, sufficient to convict Boyer of the drug conspiracy?

3.    Has Boyer demonstrated specific and compelling prejudice from the district court's denial of his motion to be tried separately from his co-conspirators?

4.    Did the evidence at trial preponderate heavily against Boyer's conviction for conspiracy, and thereby warrant a new trial, merely because the evidence demonstrated that Boyer's role was minor compared to some other members of the conspiracy?

3

5.    Did the district court abuse its discretion in denying

Chapman's motion for new trial without a hearing where Chapman

failed to establish four of the required five <u>Berry</u> factors?

**CROSS-APPEAL**

6.    Did the district court impose an illegal sentence when it

declined to sentence Perry to the statutorily mandated 25-year term of

imprisonment for a second or subsequent conviction of 18 U.S.C.

§ 924(c)?

## STATEMENT OF THE CASE

For years, Jeffery D. Perry was a multi-kilogram cocaine and crack dealer in Baton Rouge, Louisiana. Jermaine J. Chapman, also known as "Dump Truck," was Perry's most trusted associate. Charles Boyer, also known as "Slim," was a crack user who helped maintain one of Perry's "click houses" and otherwise assisted Perry as needed in the drug operation.

In September 2011, after years of investigation by the Drug Enforcement Administration (DEA) and the Baton Rouge Police Department (BRPD), Perry and Chapman were arrested as they and two associates returned from Houston with two kilograms of cocaine intended for distribution in the Baton Rouge area.

Three years later, in September 2014, Perry, Chapman, and Boyer were convicted at trial of conspiracy to distribute and to possess with intent to distribute 280 grams or more of cocaine base and five kilograms or more of cocaine. Perry and Chapman were also convicted of substantive drug trafficking and firearms offenses, and Perry was convicted of carjacking.

The Honorable Shelly D. Dick sentenced Perry to life imprisonment, Chapman to 45 years imprisonment, and Boyer to ten years imprisonment. Although Perry was convicted of two violations of 18 U.S.C. § 924(c), Judge Dick did not impose the enhanced penalty for a second conviction on either count of conviction.

Perry and Boyer appeal their convictions on Count 1, the conspiracy count, and Chapman appeals his conviction on Count 10, a firearms count. The United States, with the personal approval of the Solicitor General, cross-appeals Perry's sentence, which was imposed in violation of the enhanced penalty provision of Section 924(c).

## I.     The Offense Conduct

### A.     Drug Dealing at The Hole and The Gate

By 2005, Perry was an established drug dealer in an area of Baton Rouge, Louisiana, known as South Baton Rouge. ROA.2352, 2355, 2972, 3253. At that time, he operated out of a house on America Street where it dead-ends at Evergreen Street. ROA.1588, 2354-2355, 2448, 2930-2931, 3253. The house was referred to as "The Hole." ROA.1588, 2448, 2930, 3253. All day long, every day of the week, customers would appear at The Hole to buy crack from Perry or his partners, "Josh" and

6

Charles Hollins, who went by the name "Aaron." ROA.2358, 2366, 2932-2933, 3254-3256. Darnell Dalton, who was Perry's cousin and whose street name was "Menace," also sold dope—which he had purchased from Perry—at The Hole. ROA.2346, 2352, 2355-2356. Customers at The Hole paid with cash, food stamps, electronics, guns, tools, and other items. ROA.2358-2359.

At some point, Perry, Josh, and Hollins stopped selling at The Hole and began selling at a location known as "The Gate," which was right around the corner on Evergreen Street between America Street and Louisiana Avenue. ROA.1800, 1802-1803, 3258-3260.

Blaze Franklin, also known as "Lurch," and Mark Allen were two crack users who began buying crack from Perry at The Hole and The Gate. ROA.1787, 1799-1800, 3253, 3257, 3262-3263.

## B.    Investigatory Stop of Perry Near Baton Rouge High

On November 25, 2005, at about 10:00 p.m., BRPD Officer Brian Higginbotham observed a vehicle driven by Perry blocking South Eugene Street, which runs alongside Baton Rouge Magnet High School. ROA.952-954, 956. He then saw an unidentified individual run up to Perry's vehicle. ROA.954. After Perry and the individual appeared to

7

engage in a hand-to-hand transaction, Perry drove off, and Officer

Higginbotham conducted an investigatory stop. ROA.954-955, 965. As

Perry stood outside the car, Officer Higginbotham went to look for a

rental agreement in the vehicle's glove box. ROA.956-957. The officer

saw cash sticking out of a bulging cereal box and a plastic bag that

appeared to contain marijuana. ROA.957-958. Before Officer

Higginbotham had a chance to retrieve the drugs and cash, Perry fled

from the scene on foot. ROA.958. He was ultimately caught by police at

a house on Evergreen. ROA.959-960. Officers recovered over $18,000

in cash from the cereal box and three small bags of suspected

marijuana. ROA.962, 967, 970.

## C.    The Click House at 221 Evergreen Street

In or around 2006, Perry moved his operation to a family-owned

house located at 221 Evergreen Street, on the corner of Evergreen and

Louisiana less than a block away from The Gate. ROA.1614, 1752,

1810, 2364, 2368, 3010; U.S. Exs. 9A, 9B. Perry used the house both for

distributing drugs and for "cooking" crack, a skill he learned from

Dalton. ROA.1608, 1658, 1810, 1815-1816, 2360, 2372, 3156, 3273. He

had secret compartments called "spots" installed in the house (over a

8

doorway and under the kitchen sink) for storing drugs. ROA.1819-1821, 1905, 1907, 2397, 2997; U.S. Exs. 9D, 9F.

Customers came to the Evergreen "click house,"[1] day and night, to buy crack with cash, guns, or stolen items. ROA.1811, 1822, 1837, 2388, 2960, 2981, 2991. Perry sometimes "fronted" drugs to customers, i.e., allowed customers to buy drugs on a credit basis. ROA.2380.

Boyer, and sometimes Chapman, lived at the Evergreen click house. ROA.1682, 1953, 2019, 2374. The utilities for the house were maintained in their names, not Perry's. ROA.2147-2148, 2373; U.S. Exs. 1AA1-1AA2. Boyer, a crack user, was always at the click house and served as "the guardian" of the dope. ROA.1611, 1682, 1812, 2449, 3308. He also cleaned the kitchen after Perry cooked crack. ROA.1611, 1660, 1682, 2379, 2941, 3154. Chapman was Perry's closest friend and "right hand" man. ROA.2501, 2992, 3078, 3233. He was aware of, and used, the spots over the doorway and under the sink. ROA.1819-1821. Once, when several ounces of crack were missing, Perry beat up both Chapman and Boyer. ROA.1910-1911, 2493, 2951.

---

[1] A click house is a place where drugs are sold. ROA.2960, 2991.

Chapman, Boyer, and others assisted Perry by retrieving drugs from storage locations, weighing and bagging cocaine and crack, handling customers, purchasing supplies (plastic bags and baking soda), and disposing of kilogram wrappers.  ROA.1610, 1613, 1813, 1816-1817, 1821-1823, 1912-1913, 2369, 2371, 2374-2375, 2377-2379, 2410-2411, 2452-2455, 2498, 2942-2943, 2946-2948, 2950-2951, 2974, 3154, 3269, 3271-3272.

The guns that were bartered for drugs were kept in "The Warehouse," which was located in the back of Perry's grandfather's house on Delphine Street.  ROA.1909, 2399, 2979-80.  Sometimes, Perry and his crew had guns—including the Smith & Wesson .40 caliber pistol eventually seized from the spot under the sink—in the Evergreen click house.  ROA.2383-2385, 2984-2987; U.S. Ex. 10A.  Guns were used for protection and for robbing other drug dealers.  ROA.1834, 1847, 1897-1899, 2754-2755.

## D.    Search of 253 Delphine Street

Perry's brother, Eric Perry, who was called "Wayne,"[2] was also a crack dealer.  ROA.2381-2382, 2923, 2946.  Perry was his sole supplier.

---

[2] Because he shares Perry's surname, Eric Perry is referred to herein as Wayne.

ROA.2946, 2966.  Like Chapman and Boyer, Wayne assisted in Perry's drug dealing—among other things, he bought supplies, delivered drugs to customers, and picked up and stored guns that were traded for drugs. ROA.1610, 1613, 1838-1839, 1909, 2951, 3006, 3058, 3157.

In June 2009, less than a month after Wayne's release from jail for possessing stolen goods, his residence was searched by BRPD officers pursuant to a warrant obtained after the officers observed drugs and cash in plain view during a knock-and-talk.  ROA.973-977, 985, 1009, 1026, 2464, 2952, 2955-2956, 3073, 3103.  The residence was located at 253 Delphine, about two blocks from the Evergreen click house.  ROA.974, 1003, 2098, 2952; U.S. Ex. 2A.  Officers seized more than 58 grams of crack in 13 plastic bags, a small amount of cocaine in a plastic bag, digital scales with cocaine and crack residue, a Smith & Wesson .40 caliber pistol, and photos depicting Perry, Chapman, Wayne, Hollins, and another individual together at a nightclub. ROA.978, 1535-1537, 2957; U.S. Exs. 2B1-2B4.

As officers were standing outside, Perry walked up to the house. ROA.997, 1026, 1042.  He was irate and confronted the officers. ROA.998, 1026, 1042.  He wanted to know what they were doing and

11

demanded to see the search warrant.  ROA.998, 1042.  He was detained and eventually searched.  ROA.998.  Officers found over $5700 in cash and the keys to the residence in his pockets.  Id.

### E.    Three Kilogram Sale to William Johnson

William Johnson was one of Perry's biggest customers. ROA.1591-1592, 1605-1607, 2502.  He was first introduced to Perry by Robie Knight, another drug dealer who bought drugs from Perry. ROA.1581, 1818, 2375, 2660, 2975.  Johnson began buying cocaine from Perry when Perry was dealing at The Hole and continued when Perry moved his operation to the Evergreen click house.  ROA.1588, 1592, 1608.  Initially, Johnson would purchase 9-18 ounces of cocaine from Perry on a weekly or bi-weekly basis.  ROA.1591-1592.  He later began purchasing three to four kilograms of cocaine per month from Perry, usually one kilogram at a time.  ROA.1607, 2376, 2974.

In late August 2009, about ten days before taking a vacation on Labor Day weekend, Johnson bought three kilograms of cocaine from Perry at the Evergreen click house.  ROA.1613-1615, 1617.  He paid $31,000 per kilogram.  ROA.1614.

## F.     Attempted Purchase from "Miami"

Around the same time, in August and September of 2009, the DEA was using a confidential informant known as "Miami" to investigate narcotics trafficking in Baton Rouge.  ROA.1059-1060.  Miami was posing as a large-scale cocaine dealer with a Cuban source of supply. ROA.1061-1062.  Donald Frank, also known as "Bump," "Bumper," or "Titty Bump," made arrangements with Miami for Perry to buy 14 kilograms of cocaine.  ROA.1066, 1080-1081, 1083, 1093-1095, 2961; U.S. Exs. 1A-1H.

On September 9, 2009, Perry met with Miami outside of a washateria near Baton Rouge Magnet High School.  ROA.1095, 1546, 1565-1566.  Perry tried to convince Miami to go to Perry's house to conduct the drug transaction, but Miami refused.  ROA.1095, 1555-1556.  Perry then drove off in his black Infiniti.  ROA.1095, 1546, 1557.

A few minutes later, at Perry's request, Wayne drove up to the washateria in Perry's Infiniti.  ROA.1095-1096, 1548, 1560, 1566, 2963-2964.  Miami walked up to the Infiniti and discovered that Perry was not in the car.  ROA.1565, 2965.  Wayne said that his brother had the money and pointed Miami to Perry, who was parked nearby in a Dodge

Challenger.  ROA.1095-1096, 1558, 1565-1566, 2965.  Miami got in the

Challenger with Perry.  ROA.1566.  A few minutes later, he got out of

the car and gave the designated arrest signal to law enforcement.

ROA.1096, 1558, 1566.  Frank and Wayne were both arrested.

ROA.1567.

Before officers could arrest Perry, he sped off—driving on the

wrong side of the road and hitting a car stopped at a traffic light.

ROA.1096, 1170, 1549-1550.  He led officers on a high speed chase—

captured by a police dash camera—through a residential neighborhood

before ditching his car in a field and fleeing on foot with a large duffle

bag.  ROA.1165, 1169-1172; U.S. Ex. 1K.  During his flight from

officers, Perry discarded the duffle bag under a house.  ROA.1097, 1172.

He was apprehended shortly thereafter.  ROA.1097, 1173.  Officers

recovered the duffle bag, which contained $305,000 in cash, and seized

$5900 in cash from Perry's pocket.  ROA.1097, 1173.

## G.    Robbery of the Chinese Man

After his arrest, Perry was short on cash.  ROA.1841.  For a few

days, he was unable to obtain cocaine.  ROA.2389-2390.  He then began

purchasing cocaine from an unidentified Chinese man he had met

through Eugene Williams, whose nickname was "June."[3]  ROA.1824-1828, 3167.  Perry decided to rob the Chinese man of cocaine and solicited help from Williams and Allen.  ROA.1828-1829.  Allen sometimes lived in the Evergreen click house, and he often assisted Perry by testing crack, purchasing baggies and baking soda, and disposing of kilogram wrappers.  ROA.1814, 1816-1817, 2019, 2384.  He and Williams both agreed to help with the robbery.  ROA.1828-1829.  In particular, Williams agreed to contact the Chinese man for Perry.  ROA.1829.

A few days later, the Chinese man delivered several kilograms of cocaine to Perry at the Evergreen click house.  ROA.1829-1831.  He asked for his money, and Perry said that there was no money.  ROA.1833.  When he kept asking to be paid, Allen punched him in the back of his head and knocked him out.  ROA.1834.  Boyer then pointed a gun at him, and Perry, Boyer, and Allen told him to get out.  Id.  After the Chinese man left, Perry paid Williams and Allen $2500 each for their roles in the robbery.  ROA.1836, 1905.

---

[3] Williams was charged in the conspiracy count and was acquitted at trial.  ROA.3682.

### H.    Carjacking of William Johnson

Not long after the robbery of the Chinese man, on October 3, 2009, Perry asked Allen if he wanted to make some money by committing another robbery.  ROA.1841, 2393-2395.  Perry explained that he needed cash after losing the $305,000.  ROA.1841.  Allen agreed.  Id. Perry said that Johnson would be coming by the Evergreen click house that evening to buy several kilograms of cocaine.  ROA.1841, 1843. Perry instructed Allen that, after he robbed Johnson, he should take Johnson's car and bring the money to a house on West Street. ROA.1842, 1846.  Perry showed Allen the West Street house—which Perry and his girlfriend had just rented—and Johnson's car.  ROA.1842, 2720-2721, 2987.  He told Allen that he would provide Allen with a gun to commit the robbery.  ROA.1847.

About 30 minutes before Johnson was expected, Allen went to the Evergreen click house.  ROA.1845-1846.  Perry said that Johnson would be there in about 15 minutes, and Boyer gave him a .380 caliber pistol from under a pillow on the couch.  ROA.1846-1847, 1956.  Perry left in Wayne's car, leaving his white Honda Accord in the driveway because he wanted Johnson to think he was there.  ROA.1639-1640, 1848, 2982-

2983.  Allen went across the street and laid in wait.  ROA.1847.

Johnson arrived at the Evergreen click house at about 7:30 p.m. with $82,500 in a grocery bag behind the passenger seat of his girlfriend's Toyota Camry.  ROA.1635, 1637-1638.  He walked to the back door and saw Boyer and Williams inside.  ROA.1640, 1852.  As he stood on the steps, he heard a gun cock behind him, and then Allen told him to turn over the money.  ROA.1645, 1852-1853.  Johnson asked, "What money?"  ROA.1645.  After some back and forth, Allen shot Johnson in the arm.  ROA.1646, 1853.

Allen located the bag of money, got Johnson's car keys, and left in Johnson's Camry.  ROA.1650-1651, 1854-1855.  He parked the car in a parking lot for Baton Rouge General Hospital.  ROA.1855.  He then walked to the West Street house with the bag of money, which he turned over to Perry.  ROA.1884-1885.  After counting the money, Perry brought Allen to a hotel.  ROA.1885, 1887.  Allen had a friend pick him up and bring him to the Evergreen house, where he returned the pistol to Boyer.  ROA.1888-1889.  Allen then checked into a different hotel.  ROA.1891.

## I.    The Arming of Mark Allen

Allen's girlfriend told him to lay low because Knight was after Allen for shooting Johnson, who was Knight's close friend.  ROA.1892. Perry and Williams came to the hotel that night, and Perry gave Allen $5000 and some crack.  ROA.1894.  The next day, Allen heard that Knight was looking for him.  ROA.1897.  He called Perry and said that he needed a gun to protect himself.  Id.  That afternoon, Perry and Williams again came to the hotel.  ROA.1898-1899.  At Perry's direction, Williams handed Allen a Taurus .40 caliber handgun. ROA.1899; U.S. Ex. 7A.  At the time, Perry was a convicted felon, and he knew that Allen was a convicted felon.  ROA.1804, 3175.  Allen had seen the gun about a month earlier when someone traded it to Perry for crack.  ROA.1837-1838.  Two days after receiving the gun, Allen was arrested, and the gun was seized.  ROA.1780-1781, 1783, 1903-1904.

## J.    The Click House at 321 Delphine

Beginning sometime in late 2009 and continuing through 2010, in addition to the click house on Evergreen, Perry operated a click house at 321 Delphine Street.  ROA.2390, 2398, 2638, 2641-2642, 3271, 3275.

Perry, Dalton, Chapman, and Dalton's brother Shaquille Dalton,[4] also known as "Shaq," sold drugs there.  ROA.2346, 2398, 2643-2644, 2646. The Delphine click house was a "weight house," meaning that only dealers were allowed in.  ROA.3346-3347, 3356.

### K.    Cash Seizure on Interstate 10

About a month after the shooting of Johnson, on November 1, 2009, a Louisiana state trooper stopped Perry in a silver Honda Accord on I-10 East in Baton Rouge for improper lane usage, speeding, and no license plate.  ROA.2035-2037.  The vehicle had been purchased by Perry in the name of Michelle Lopreiato, a friend's girlfriend, who had never even seen the car.  ROA.2039, 2057, 2064-2067; U.S. Ex. 1P2. While the trooper spoke with Perry outside of the car, he smelled alcohol, so he conducted a field sobriety test.  ROA.2037.  Perry failed the test, and the trooper attempted to arrest him for driving under the influence.  ROA.2038.  Perry then broke away from the two officers at the scene and ran out onto the Interstate.  Id.  The troopers were able to apprehend Perry only by tasing him after he doubled-back toward the officers.  ROA.2038-2039.

---

[4]  Shaquille is referred to by his first name to distinguish him from his brother Darnell Dalton.

An inventory search of the Accord revealed bundles of cash totaling approximately $34,000.  ROA.2039, 2041, 2055-2056; U.S. Ex. 1L7.

## L.     Searches of the Evergreen Click House

In early 2010, just a few months after the cash seizure, BRPD officers conducted periodic surveillance of the Evergreen click house and observed activity consistent with narcotics trafficking.  ROA.2099. During the surveillance, officers saw Perry and Chapman at the house five to ten times.  Id.  On March 25, 2010, BRPD officers executed a search warrant at the house.  Id.  The officers did not find any guns or drugs in the house, but they located the secret compartment Perry had installed above a door.  ROA.2101, 2132.  Boyer and another man were the only people present at the time the warrant was executed. ROA.2102.

Several months later, on July 1, 2010, BRPD officers executed another warrant at the house.  Id.  This time, officers found bags of cocaine (approximately 35 grams) and crack (approximately 77 grams) in the spot above the door, two loaded firearms in the secret compartment under the sink, numerous digital scales with drug residue

(including one with Perry's fingerprints), a traffic citation issued to Chapman, and baggies, baking soda, and other paraphernalia for cooking crack in the kitchen.  ROA.2103-2121, 2172-2177, 2204-2208, 2229; U.S. Exs. 9F, 10A-10D.  The only two persons present—Jeremy Hilliard and John West—were arrested.  ROA.2102, 2128.

## M. Seizure of Cash from Hidden Compartment in White Honda

Not long after the second warrant was executed, on September 15, 2010, Perry and his brother, Jonathan Perry,[5] were stopped in Perry's white Honda Accord by a deputy with the Jefferson County Sheriff's Office near Beaumont, Texas, for following too closely.  ROA.2308-2310, 2923, 2996, 3196.  The car was in the name of Tanjanika Matthews, one of Perry's girlfriends.  ROA.2310, 2987.  Perry gave consent to search the vehicle, and officers discovered a hidden compartment behind the rear seat.  ROA.2312-2313, 2315; U.S. Ex. 1S.  The compartment, which was rigged to open and close electronically and which smelled like crack, contained $71,000 in cash.  ROA.2316, 2319-2320; U.S. Exs. 1S, 1T16.

---

[5] Jonathan Perry, who shares a surname with his brothers Jeffery and Wayne, is referred to herein by his first name only.

### N.    The Click House at 2402 Louisiana Avenue

In around late 2010, Perry moved his distribution operation from the Evergreen house to a house right across the street at 2402 Louisiana Avenue—the same house where Allen laid in wait to rob Johnson.  ROA.1644, 1844, 2098, 2653, 2697, 2989, 2991; U.S. Ex. 15.  By that time, Boyer had moved to California.  ROA.2702, 3057, 3405, 3410-3411.  Perry let two young brothers from the neighborhood, Jonathan Johnson and Joshua Johnson,[6] also known as "Dew Baby," live in the house.  ROA.2635-2636, 2649, 2697, 2994, 2998.  A large poster from the movie "Blow"—depicting drug dealers surrounded by stacks and stacks of cash—hung in the living room.  ROA.2659; U.S. Ex. 1U17.  Perry continued to use the Evergreen house, including the spot under the sink, as a place to store drugs.  ROA.2662, 3282.

Perry cooked crack in the kitchen about every other day.  ROA.2650, 3156.  Chapman, Jonathan Johnson, Joshua, Shaquille, and Reva Compton, one of Perry's girlfriends, were allowed to handle sales.  ROA.2456, 2502, 2664-2665, 2715, 3277, 3309.  They also provided other assistance, such as retrieving drugs from Evergreen, weighing the

---

[6] Jonathan Johnson is referred to herein by his full name to distinguish him from Jonathan Perry and William Johnson.  Joshua Johnson is referred to simply as Joshua.

crack, and purchasing supplies.  ROA.2454, 2651, 2663-2664, 2698-2699, 2717, 2992, 3281-3282.

## O.    Discarding of Gun During High Speed Chase

Perry was again encountered by law enforcement about six weeks after he was stopped in Texas.  ROA.2243-2244.  On October 30, 2010, a BRPD officer stopped Perry after he sped out of a Walgreen's parking lot at about 4:00 a.m.  ROA.2243-2244.  The officer learned that there was a felony warrant for Perry so he frisked Perry.  ROA.2248-2249.  When the officer began to pat down Perry's left front pocket, Perry resisted.  ROA.2249.  Perry struck the officer in the chest, broke free, and sped off in his car.  ROA.2250-2251.  He led the officer on a high speed chase—recorded by the officer's dash camera—through a residential neighborhood.  ROA.2245-2246, 2252; U.S. Exs. 11A-11A1.  Along the way, he threw a gun out of the window.  ROA.2401.  The pursuit ended at 253 Delphine, where Perry was arrested.  ROA.2255-2256.  Perry had $5559 in cash in his left front pocket.  ROA.2256.

Officers re-traced the route Perry had driven and found a loaded "38 Special" revolver under a car in a driveway on the driver's side of Perry's route.  ROA.2256, 2269-2272, 2274; U.S. Ex. 11D.  The grip of

the gun was broken, and the metal was scratched.  ROA.2270; U.S. Exs. 11D, 11E.

**P.    Distribution to Darnell Dalton**

Days after his arrest, Perry was back in the game.  About the second week of November 2010, Perry brought 2¼ ounces of powder cocaine to Dalton.  ROA.2402.  He was accompanied by Chapman.  Id. On November 12, 2010, law enforcement officers executed a search warrant at Dalton's home and found 28 grams of crack which had been converted from the cocaine.  ROA.2333-2334, 2401-2402, 2407.  The crack was in a safe along with three guns.  ROA.2333-2334.

**Q.    Controlled Buys by Robie Knight**

In July 2011, Knight became a confidential informant for the DEA.  ROA.2575.  On July 13, 2011, and July 21, 2011, Knight went to the Louisiana Avenue click house and purchased crack from Perry—61 grams on July 13 and 330 grams on July 21.  ROA.2577, 2583-2584, 2589, 2593, 2595-2596, 2607-2608.  Both times, Knight was equipped with an audio and video recording device.  ROA.2582, 2593; U.S. Exs. 13A1-13A1b, 15A1-15A7.  In the July 21 video, Perry can be seen cooking and bagging the crack.  U.S. Exs. 15A5-15A7.

### R.    Arrest of Jonathan Perry

On July 21, 2011, Dalton gave Jonathan an ounce of crack.

ROA.2403.  Perry had fronted the crack to Dalton, and Dalton still owed

Perry $900 for it.  ROA.2404.  The same day, BRPD officers

investigating a tip approached Jonathan and patted him down.

ROA.2404, 2626-2627.  A bag containing 25 grams of crack fell out of

his pants, and he tried to kick it underneath his truck.  ROA.2627-2628,

2632.  As a result, he was arrested.  ROA.2628.

### S.    Trips to Houston

In late 2011, Perry and Chapman, accompanied by Jonathan

Johnson, Joshua, and/or Franklin, made several trips to Houston to

purchase cocaine.  ROA.3016, 3018, 3193-3194, 3196-3197, 3221-3223,

3281, 3285, 3306.  On each trip, Perry drove his white Honda Accord

(the vehicle with the secret compartment) and Chapman drove Perry's

black Toyota Solara (registered first to Kandi Brown, one of Perry's

girlfriends, and later to Jonathan Johnson).  ROA.2735-2736, 2987,

3016, 3197, 3222-3223, 3285, 3290; U.S. Exs. 1W, 1X.  When they got to

Houston, they would meet up at a Walmart.  ROA.3201, 3223, 3286,

3290.  Perry would drive off in the Toyota, leaving the others with the

Honda.  ROA.3202, 3224, 3286-3287, 3290.  About 45 minutes later,

Perry would meet his crew at a nearby gas station where they would

switch cars again before heading back to Baton Rouge.  ROA.3203-3205,

3225-3226, 3287-3288; U.S. Exs. 17DD1-17DD7.

On September 18, 2011, BRPD Lieutenant Wayne Brashier

received information that Perry would be making a trip to Houston to

purchase cocaine.  ROA.2849.  Lieutenant Brashier and other officers

conducted surveillance and observed Perry driving the Honda and

Chapman driving the Toyota on I-10 West over the Atchafalaya

spillway.  ROA.2849, 2852-2855.  Officers made plans to intercept the

vehicles later that day on their return from Houston.  ROA.2856, 2860.

That evening, Perry and Jonathan Johnson were stopped on I-10 East

in West Baton Rouge Parish right outside of Baton Rouge.  ROA.2773-

2775.  Both were arrested.  ROA.2776, 3229.  Chapman and Franklin

were stopped shortly after exiting the Interstate in Baton Rouge.

ROA.2787-2788, 3306.  Approximately two kilograms of cocaine were

located in a hidden compartment in the Toyota.  ROA.2787, 2795, 2799,

2816, 2867; U.S. Ex. 17A.  Chapman and Franklin were arrested.

ROA.2787, 2795, 3292, 3331.

## II.    Proceedings in the District Court

### A.    The Charges

On July 11, 2013, the grand jury returned a nineteen-count second superseding indictment against Perry, Wayne, Jonathan, Chapman, Boyer, Williams, Jonathan Johnson, and Franklin.  ROA.123-144 (Perry's RE Tab 3).  Perry, Chapman, and Boyer were charged as follows:

- Count 1 (Perry, Chapman, and Boyer) – conspiracy to distribute and possess with intent to distribute 280 grams or more of cocaine base and five kilograms or more of cocaine, in violation of 21 U.S.C. § 846;

- Count 2 (Perry and Chapman) – possession of 28 grams or more of cocaine base with intent to distribute, in violation of 21 U.S.C. §  841(a)(1) (regarding the crack seized from 253 Delphine in June 2009);

- Count 3 (Perry and Chapman) – possession of a firearm in furtherance of the drug trafficking crimes charged in Counts 1 and 2, in violation of 18 U.S.C. § 924(c)(1)(A) (regarding the Smith and Wesson firearm seized from 253 Delphine in

June 2009);

- <u>Count 4</u> (Perry and Chapman) – distribution of 500 grams or more of cocaine, in violation of 21 U.S.C. § 841(a)(1) (regarding the distribution of three kilograms of cocaine to Johnson in August 2009);

- <u>Count 5</u> (Perry and Boyer) – carjacking of Johnson, in violation of 18 U.S.C. § 2119;

- <u>Count 6</u> (Perry and Boyer) – use, carrying, and discharge of a firearm during and in relation to the carjacking (Count 5) and the drug conspiracy (Count 1), in violation of 18 U.S.C. § 924(c)(1)(A)(iii);

- <u>Count 7</u> (Perry) – possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (regarding Perry's possession of the Taurus pistol provided to Allen for protection);

- <u>Count 8</u> (Perry) – aiding and abetting Allen's possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (regarding the Taurus pistol provided to Allen for protection);

28

- <u>Count 9</u> (Perry and Chapman) – possession of cocaine and 28 grams or more of cocaine base with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (regarding the drugs seized from the Evergreen click house in July 2010);

- <u>Count 10</u> (Perry and Chapman) – possession of firearms in furtherance of the drug trafficking crimes charged in Counts 1 and 9, in violation of 18 U.S.C. § 924(c)(1)(A) (regarding the firearms found in the spot under the sink at the Evergreen click house in July 2010);

- <u>Count 11</u> (Perry) – possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (regarding the firearm discarded by Perry during his flight from the police in October 2010);

- <u>Count 12</u> (Perry and Chapman) – distribution of cocaine, in violation of 21 U.S.C. § 841(a)(1) (regarding the drugs seized from Dalton's home on November 12, 2010);

- <u>Count 13</u> (Perry and Chapman) – distribution of 28 grams or more of cocaine base, in violation of 21 U.S.C. § 841(a)(1) (regarding Knight's controlled buy on July 13, 2011);

29

- <u>Count 14</u> (Perry and Chapman) – possession of cocaine base with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (regarding the crack seized from Jonathan Perry on July 21, 2011);

- <u>Count 15</u> (Perry and Chapman) – distribution of 280 grams or more of cocaine base, in violation of 21 U.S.C. § 841(a)(1) (regarding Knight's controlled buy on July 21, 2011); and

- <u>Count 17</u> (Perry and Chapman) – possession of 500 grams or more of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (regarding the two kilograms of cocaine seized after the trip to Houston on September 18, 2011). [7]

<u>Id</u>.

### B.    Boyer's Motion to Sever

Prior to trial, Boyer—who was charged only with the drug conspiracy (Count 1) and with the carjacking and gun charges related to the robbery of William Johnson (Counts 5 and 6)—filed a motion to sever.  ROA.6679-6690.  Boyer alleged that he would be prejudiced at a joint trial by the spillover effect of evidence regarding co-defendants—

---

[7] Perry and Chapman were also charged in Count 16 with distribution of cocaine in violation of 21 U.S.C. § 841(a)(1).  The count was dismissed during trial.  ROA.619.

specifically, evidence of offenses with which he was not charged, evidence of co-defendant conduct (including firearms offenses) committed after he left the state in early 2010, and evidence of the felony status of co-defendants. ROA.6684-6685, 6687, 6689. Boyer also argued that a "fair reading of the indictment" suggested that there were multiple conspiracies and that the Government therefore faced a "risk of variance" at trial. ROA.6687.

Noting the "well-recognized preference . . . for joint trials of defendants who are indicted together," the district court denied the motion. ROA.6716-6717. The court concluded that, "[w]hile there might be a possibility of prejudice [to Boyer] in a joint trial," the court could "sufficiently mitigate the possibility of prejudice through jury instructions and by continuing to monitor th[e] case as it progresse[d] to trial." ROA.6718.

## C.    The Trial

The trial of Perry, Chapman, Boyer, and Williams commenced on September 8, 2014, before the Honorable James J. Brady. ROA.558. After five days of trial, Judge Brady was hospitalized, and the Honorable Shelly D. Dick began presiding over the trial. ROA.614-615,

617-618, 2522. Pursuant to Rule 25(a)(2), Fed. R. Crim. P., Judge Dick certified that she was familiar with the record. ROA.617-618, 2562-2563.

The United States called 44 witnesses. ROA.561-565, 573, 614-615, 617-621, 641-642. Johnson, Allen, Wayne, Dalton, Jonathan Johnson, and Franklin testified for the United States after pleading guilty pursuant to plea agreements. ROA.563, 573, 618, 621, 641-642, 1574, 1791-1792, 2346-2347, 2637, 2925, 3252. Among other evidence, the United States introduced evidence of guns, drugs, and cash seized during the investigation. See, e.g., U.S. Exs. 1L7, 1T16, 9N2, 10A, 11D, 17A. The United States also presented audio and video recordings from the deal Frank brokered for Perry with Miami, the Robie Knight controlled buys, and Perry's high-speed flights from officers. U.S. Exs. 1A-1K, 11A-11A1, 13A1-13A1b, 15A1-15A7. At the conclusion of the Government's case and again at the close of evidence, all defendants moved for judgment of acquittal. ROA.642, 644. The motions were denied. Id.

In its jury charge, the court instructed the jury to consider each defendant and each count separately:

> Each count, and the evidence pertaining to it,
> should be considered separately. The case of each
> defendant should be also considered separately
> and individually. The fact that you may find one
> or more of the accused guilty or not guilty of any
> of the crimes charged should not control your
> verdict as to any other crime or any other
> defendant. You must give separate consideration
> to the evidence as to each defendant.

ROA.3653. It also instructed the jury on the Pinkerton[8] theory of co-conspirator liability: "A conspirator is responsible for offenses committed by other conspirators if the conspirator was a member of the conspiracy when the offense was committed, and if the offense was committed in furtherance of, or as a foreseeable consequence of, the conspiracy." ROA.3651.

The jury returned its verdicts on September 23, 2014. ROA.665-688 (Perry's RE Tab 5), 5325-5342 (Chapman's RE Tab 4), 7042-7046 (Boyer's RE Tab 6). Perry was found guilty on Counts 1, 2, 4-11, 13-15, and 17 and was found not guilty on Count 3 (possession of the firearm found at 253 Delphine) and Count 12 (distribution to Dalton). ROA.665-688 (Perry's RE Tab 5). Chapman was found guilty on Counts 1, 4, 9, 10, 13-15, and 17 and was found not guilty on Counts 2 and 3

---

[8] In United States v. Pinkerton, 328 U.S. 640 (1946), the Supreme Court held that all conspirators are liable for the substantive offenses committed in furtherance of the conspiracy.

(possession of the gun and drugs found at 253 Delphine) and Count 12 (distribution to Dalton). ROA.5325-5342 (Chapman's RE Tab 4). Boyer was found guilty on Count 1 and not guilty on Count 5 (carjacking of Johnson) and Count 6 (discharge of a firearm during the carjacking). ROA.7042-7046 (Boyer's RE Tab 6). Williams was found not guilty on the conspiracy count (Count 1), the only count with which he was charged. ROA.3682.

### D.    Post-Trial Motions

#### 1.    Boyer's Motion for Judgment of Acquittal or New Trial

On October 7, 2014, fourteen days after the verdicts, Boyer filed a "Post-Trial Motion for Judgment of Acquittal." ROA.7049-7060. Although the motion itself sought only a judgment of acquittal under Rule 29, Fed. R. Crim. P., the memorandum in support of the motion requested a new trial under Rule 33, Fed. R. Crim. P., as alternative relief. Id. The United States and the district court treated the motion as one for a judgment of acquittal or, alternatively, a new trial. See ROA.7079, 7100-7101.

Among other things, Boyer argued that there was insufficient evidence to support the verdict and that he was prejudiced by the

34

spillover effect of evidence regarding his co-defendants. ROA.7055, 7058-7059. The United States filed an opposition, arguing that there was ample evidence of guilt and that Boyer was not prejudiced by a joint trial. ROA.7075-7093. The district court denied the motion. ROA.7102. The court concluded that the verdict was supported by sufficient evidence and that there were "no extraordinary circumstances justifying a new trial." ROA.7100-7102.

### 2. Motions by Perry and Chapman for New Trial Based on Newly Discovered Evidence

On March 10, 2015, Perry filed a "Motion for Evidentiary Hearing and New Trial." ROA.742-745. Perry alleged that, subsequent to trial, he discovered new evidence related to Count 10, which charged possession of the guns found under the sink at the Evergreen click house. ROA.742. In support of the motion, Perry attached a short, undated declaration, not made under penalty of perjury, by one of Perry's attorneys. ROA.744. The declaration represented that John West, one of the men arrested at the Evergreen house on the day the guns were found, told the attorney that the guns belonged to him, that he had stored them at the Evergreen house with the intent to sell them, and that he did so without Perry's knowledge. Id. Based on the

35

declaration, Perry requested an evidentiary hearing and a new trial. ROA.742.

Chapman, who was also convicted on Count 10, filed a motion to adopt Perry's motion for new trial. ROA.746-748. The motion was granted. ROA.5370.

The United States filed an opposition, asserting that the motion should be denied without a hearing. ROA.754-840. The United States argued that the motion failed to address any of the prerequisites for a new trial based on newly discovered evidence, including post-trial discovery, due diligence, materiality, and probable acquittal. ROA.758-759, 763. With regard to due diligence, the United States pointed out that, long before trial, Perry and Chapman had been provided with the police report describing West's arrest at the Evergreen house on the day the guns were found. ROA.755. With regard to the likely effect of West's information, the United States noted in particular that West's storage of guns in a hidden compartment in the click house would actually be strong evidence that West was a member of the conspiracy— and that Perry and Chapman were guilty under the Pinkerton rule of co-conspirator liability. ROA.760, 762.

The district court denied the motion without a hearing.  ROA.850, 854.  At the outset, the court noted that the movants failed to address any of the five elements required to justify a new trial based on newly discovered evidence.  ROA.850.  The court then concluded, without addressing the first four elements, that the fifth element was not established: "the newly acquired evidence would not 'probably' result in acquittal."  Id.  The court found that it was "improbable and highly unlikely that West would have gained access to the 'click' house and knowledge of its hidden compartments" without the consent of Perry or Chapman unless he was a participant in the conspiracy.[9]  ROA.852.  In such case, Perry and Chapman would be responsible under the Pinkerton doctrine.  ROA.853.  Thus, the court concluded that, even if West were to testify at a new trial that he stored the guns under the sink without Perry's knowledge, it is unlikely that the jury would find Perry and Chapman not guilty.  Id.

---

[9] The court mistakenly reported that Dalton and Allen testified that Perry and Chapman "used secret compartments to conceal weapons and drugs."  ROA.853.  In fact, Allen testified that drugs were hidden in the secret compartments, and Dalton testified that the spots were for hiding "stuff."  ROA.1820-1821, 1907.  Neither testified that weapons were concealed in the compartments.  Wayne testified that he knew of the spot above the doorway, but had never seen it.  ROA.2997.  He was not aware of the hidden compartment under the sink.  Id.

**E.     Sentencing**

Perry's Presentence Report (PSR) was disclosed on March 24, 2015, and an addendum was disclosed on July 7, 2015.  ROA.3717, 3809.  The PSR and its addendum exposed Perry's extremely violent history.  In addition to the robberies that were proved at trial, the PSR and addendum disclosed the following acts of violence committed or commissioned by Perry.  In 1999, when he was just sixteen, Perry shot and killed a woman who assisted his father in confirming that he was dealing drugs.  ROA.3751, 3785-3787.  In 2009, Perry hired his uncle and two juveniles to set fire to the home of an elderly man. ROA.3739, 3769-3771.  Perry thought the man was responsible for the police seizure of the duffle bag containing the $305,000 he intended to pay Miami.  Id.  The juveniles caught themselves on fire during the arson and later died.  Id.  In July 2011, Perry hired a hit man to kill a man he believed had provided information leading to Jonathan's arrest. ROA.3734, 3766-3768.  The hit man killed the victim by shooting him with an assault rifle in the face, chest, shoulder, and back.  Id.  In September 2011, Perry arranged for Knight's murder.  ROA.3734-3735, 3771-3775.  The murder was carried out after Knight was lured to the

Louisiana Avenue click house for a card game.  Id.  Chapman paid the assassin $10,000 on Perry's behalf.  ROA.3735, 3773-3774.

The PSR reported that the mandatory minimum term of imprisonment under 18 U.S.C. § 924(c) for Count 6 (use, carrying, and discharge of a firearm during and in relation to a drug trafficking crime and a crime of violence) was ten years and for Count 10 (possession of a firearm in furtherance of drug trafficking crimes) was five years.  ROA.3718, 3761.  The United States objected, arguing that Count 10 qualified as a second conviction under Section 924(c) and that the mandatory minimum for that count should therefore be 25 years.  ROA.3784-3785, 3787-3788.  In support of the objection, the United States cited Deal v. United States, 508 U.S. 129 (1993), in which the Supreme Court held that the enhanced penalty for a second or subsequent conviction under Section 924(c) applies when a defendant is convicted of multiple counts in a single proceeding.  ROA.3785, 3788.  The probation officer agreed with the objections.  ROA.3784, 3788-3789.

Perry's sentencing was held on August 19, 2015.  ROA.3686.  The court denied the Government's objections regarding the

mandatory minimum sentence on Count 10. ROA.3693-3694. The court acknowledged the <u>Deal</u> decision but nevertheless declined to impose a 25-year minimum sentence on either of the 924(c) counts because it was unable to determine "which conviction the jury concluded first because of the secrecy of the jury deliberations." <u>Id</u>. The United States objected. ROA.3694. The court imposed a ten-year sentence on Count 6 and a five-year sentence on Count 10. ROA.3712. In total, Perry was sentenced to life plus 15 years. <u>Id</u>.; ROA.858 (Perry's RE Tab 4).

On June 16, 2015, Chapman was sentenced to a 45-year term of imprisonment, and, on June 22, 2015, Boyer was sentenced to a ten-year term of imprisonment. ROA.4826 (Chapman's RE Tab 1), 5396 (Chapman's RE Tab 5), 6485 (Boyer's RE Tab 1), 7112 (Boyer's RE Tab 5).

## SUMMARY OF THE ARGUMENT

**MAIN APPEAL**

1.    The United States presented overwhelming evidence that Perry conspired with others to possess and distribute crack and cocaine. Perry admitted at trial and admits in this Court that he was, in fact, a drug dealer.  He argues only that he did not conspire with others.  At trial, however, witness after witness testified that numerous individuals assisted Perry in his drug dealing.  If that testimony is taken as true, which it must be, it alone is more than enough evidence for a rational jury to find Perry guilty of conspiracy.  On top of that, the United States presented substantial evidence corroborating the witnesses and demonstrating the participation of other conspirators.

2.    The evidence of Boyer's guilt on the conspiracy count was more than sufficient.  Boyer suggests that the evidence established only that he bought and sold crack "on his own" and that he ran an occasional errand for Perry.  That view, however, simply ignores much of the Government's evidence.  The evidence demonstrated, among other things, that Boyer helped maintain one of Perry's click houses, protected Perry's drugs, participated in robberies of other drug dealers,

bought supplies for Perry, retrieved drugs for Perry, weighed and
bagged crack for Perry, and handled sales for Perry.  There was,
therefore, ample evidence that Boyer conspired with Perry to distribute
drugs.

      3.    Boyer has demonstrated no specific and compelling prejudice
from the denial of his motion to sever.  His joint trial with his co-
conspirators was consistent with the general rule that jointly indicted
defendants should be tried together, especially in conspiracy cases.  The
trial judge dutifully instructed the jury to consider each defendant and
each count separately.  True to its obligation, the jury acquitted all
defendants of some counts and acquitted one defendant entirely.  In any
event, there was no risk of prejudicial spillover because virtually all of
the evidence would have been admissible against Boyer in a separate
trial.

      4.    The district court did not abuse its discretion in denying
Boyer's motion for new trial.  Boyer contends that the verdict was
against the weight of the evidence.  He argues that the evidence failed
to demonstrate that he exercised control over the organization, that he
understood the full scope of the conspiracy, or that he was motivated by

anything other than obtaining crack.  But such showings are not required to convict a defendant of conspiracy.  In short, there is no reason to disturb the district court's decision that the verdict was supported by the evidence.

5.    Chapman failed to demonstrate that he was entitled to a new trial based on West's hearsay claim that Perry was unaware of the guns under the sink at the Evergreen click house.  A defendant seeking a new trial based on newly discovered evidence must establish all five of the so-called <u>Berry</u> factors: (1) that the evidence was discovered after trial; (2) that the failure to discover the evidence before trial was not due to a lack of due diligence; (3) that the evidence is material; (4) that it is not merely cumulative or impeaching; and (5) that it would probably result in an acquittal if presented at a new trial.  Chapman made no showing that the evidence was newly discovered or that he exercised due diligence.  Additionally, the information from West is not material because it is inadmissible hearsay.  Finally, the information would not likely produce an acquittal if introduced at a new trial: it relates to Perry, not Chapman; it is incredible; and it supports a guilty verdict under <u>Pinkerton</u>.

43

**CROSS-APPEAL**

6.    The district court erred in declining to impose the statutorily required enhanced minimum penalty of 25 years imprisonment for a second conviction on either of Perry's convictions for violating 18 U.S.C. § 924(c).  While there is some ambiguity as to which of Perry's two convictions constitutes the second conviction, there is no doubt that the penalty must be imposed on one of the counts.  Imposition of the enhanced penalty on Count 6 (charging discharge) would produce a lesser sentence than imposition of the enhanced penalty on Count 10 (charging possession).  Therefore, in accordance with the rule of lenity, the district court should have imposed a 25-year sentence on Count 6.

## ARGUMENT

## MAIN APPEAL

**I.    The United States presented more than sufficient evidence that Perry conspired with others to possess and distribute crack and cocaine and that Boyer intentionally participated in that conspiracy.**

### A.    Standard of Review

A preserved challenge to the sufficiency of the evidence is reviewed by this Court *de novo*, using the same standard as a district court in ruling on a motion for acquittal: could any rational jury find that all elements of the crime were proved beyond a reasonable doubt? United States v. Garcia, 567 F.3d 721, 734 (5th Cir. 2009); United States v. Wise, 221 F.3d 140, 147 (5th Cir. 2000).

Although the review is *de novo*, it is "highly deferential to the verdict." United States v. Bowen, 818 F.3d 179, 186 (5th Cir. 2016) (quotation marks and citation omitted).  Indeed, when presented with a sufficiency challenge, this Court "search[es] the record for evidence" supporting the verdict.  United States v. Mulderig, 120 F.3d 534, 546 (5th Cir. 1997).  The Court "view[s] the evidence in the light most favorable to the government and give[s] the government the benefit of all reasonable inferences and credibility choices."  United States v.

45

Barnes, 803 F.3d 209, 216 (5th Cir. 2015) (quotation marks and citation omitted).  "In effect, the court assumes the truth of the evidence offered by the prosecution."  United States v. Robertson, 110 F.3d 1113, 1117 (5th Cir. 1997).  Where there is conflicting evidence, the Court accepts the version supportive of the verdict.  United States v. Cannon, 750 F.3d 492, 506 (5th Cir. 2014).

Because the jury alone is charged with making credibility determinations, this Court does not evaluate the credibility of witnesses in considering the sufficiency of evidence.  United States v. Davis, 752 F.2d 963, 968 (5th Cir. 1985).  In other words, witness credibility is "beside the point" on appeal.  United States v. Greenwood, 974 F.2d 1449, 1458 (5th Cir. 1992).  Even the uncorroborated testimony of a cooperating defendant can sustain a conviction, as long as it is not incredible as a matter of law.  Bowen, 818 F.3d at 186.  "Testimony is incredible as a matter of law only if it relates to facts that the witness could not possibly have observed or to events which could not have occurred under the laws of nature."  United States v. Bermea, 30 F.3d 1539, 1552 (5th Cir. 1994).

The bottom line, as recognized by this Court, is that a defendant

who challenges the sufficiency of the evidence "swims upstream."

Mulderig, 120 F.3d at 546.

### B.    The Elements of Conspiracy

To convict a defendant of a drug conspiracy in violation of 21

U.S.C. § 846, the United States must prove three elements: "1) the

existence of an agreement between two or more persons to violate

narcotics laws, 2) knowledge of the conspiracy and intent to join it and

3) voluntary participation in the conspiracy." United States v. White,

219 F.3d 442, 445 (5th Cir. 2000).

The Supreme Court has explained that "the fundamental

characteristic of a conspiracy is a joint commitment" to an illegal

endeavor. Ocasio v. United States, 136 S.Ct. 1423, 1429 (2016). The

agreement, or commitment, of the conspirators need not be explicit.

United States v. Shoemaker, 746 F.3d 614, 623 (5th Cir. 2014). Rather,

the agreement "may be inferred from concert of action." United States

v. Beacham, 774 F.3d 267, 272 (5th Cir. 2014) (quotation marks and

citation omitted).

A sale of drugs does not amount to a conspiracy between the buyer and the seller.  United States v. Delgado, 672 F.3d 320, 333 (5th Cir. 2012) (en banc).  As this Court has explained, "[t]he buyer-seller exception prevents a single buy-sell agreement, which is necessarily reached in every commercial drug transaction, from automatically becoming a conspiracy to distribute drugs."  Id.

A conspirator must have specific intent that the crime which is the object of the conspiracy be committed.  Ocasio, 136 S.Ct. at 1429. However, the prosecution need not prove a defendant's motive or subjective intent.  United States v. Holmes, 406 F.3d 337, 353 (5th Cir. 2005).  The jury is entitled to infer that a defendant intends the probable consequences of his actions.  United States v. Stoker, 706 F.3d 643, 646-647 (5th Cir. 2013).

A defendant's participation in a conspiracy may be minor compared to the roles of other conspirators.  United States v. Brown, 727 F.3d 329, 339 (5th Cir. 2013).  Thus, "[i]f conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators." Salinas v. United States, 522 U.S. 52, 64 (1997).  The prosecution need

48

produce only "slight evidence" to establish that a particular defendant participated in the conspiracy. United States v. Krenning, 93 F.3d 1257, 1265 (5th Cir. 1996) (citations omitted). A defendant's presence at the scene of a crime and close association with conspirators are relevant in determining whether the defendant participated in the conspiracy. United States v. Cardenas, 9 F.3d 1139, 1157 (5th Cir. 1993).

## C.    Discussion

### 1.    Perry

Perry challenges the sufficiency of the evidence on Count 1, the conspiracy count.[10] He readily admits that he was a drug dealer, but he maintains that his drug dealing was a one-man show, not a joint

---

[10] Perry's statement of the case advises that he "appeals his conviction and sentence on all counts of the indictment," but his issue statement and argument relate only to his conviction on the conspiracy count. Compare Perry's Br. at 2 with id. at 1, 16-28. Because the jury was instructed on Pinkerton liability, insufficiency of the evidence on the conspiracy count could amount to insufficiency on some of the substantive counts as well. ROA.3651; see, e.g., United States v. Sacerio, 952 F.2d 860, 866 (5th Cir. 1992) (where Pinkerton was only viable theory of guilt on possession count, insufficiency of evidence as to conspiracy required reversal on possession count). Perry, however, fails to identify, which, if any, substantive counts should fall if the conspiracy count is reversed. Because Perry has failed entirely to brief the sufficiency of the evidence on any count other than the conspiracy count, any challenge to the substantive counts is waived. See Fed. R. App. P. 28(a)(8)(A); United States v. Reagan, 596 F.3d 251, 254-255 (5th Cir. 2010) (failure to brief constitutes waiver).

venture.[11]  Perry's Br. at 16.  He insists that the United States proved

only buyer-seller relationships with customers which, absent proof of an

agreement for re-sale, do not constitute a conspiracy: "[t]he

Government's proof demonstrated nothing more than various arm's-

length transactions between buyers and sellers."  Perry's Br. at 18.  But

the United States proved much more than buyer-seller relationships.

As detailed below, the United States presented overwhelming evidence

that Perry employed the knowing assistance of numerous others in his

distribution operation.  That is a conspiracy, plain and simple.

Six cooperators testified at trial about Perry's drug operation—

Johnson, Allen, Dalton, Jonathan Johnson, Wayne, and Franklin.  All of

them testified about the roles played by others in helping Perry

distribute cocaine and crack.[12]  While Perry suggests that the

cooperators were not credible, see Perry's Br. at 4, 10-14, 24-25, the

credibility of the witnesses is, at this stage of the proceedings, "beside

---

[11]  Perry made the same concession in the district court.  ROA.944, 947, 3571-3572, 3574, 3577, 3593-3598.

[12]  Strangely, Perry's brief makes numerous references to the testimony of Robie Knight and asserts that the prosecution "heavily relied" on Knight's testimony. Perry's Br. at 14, 24-26.  But Knight did not testify at trial.  He was murdered at Perry's direction in September 2011, less than two weeks before Perry's arrest. ROA.3734-3735, 3771-3775.

the point." See Greenwood, 974 F.2d at 1458.

Johnson, who was one of Perry's biggest customers, testified that Chapman, Dalton, and Wayne sometimes handed him the cocaine he purchased from Perry. ROA.1613. He also testified that Chapman, at times, retrieved the drugs for Perry to distribute. ROA.1594.

Allen admitted committing two robberies in furtherance of Perry's drug operation and explained the supporting roles of Boyer and Williams in the robberies. ROA.1828-1829, 1834, 1836, 1841, 1847, 1852-1855, 1885-1886, 1889-1890, 1899, 1905. He also testified that he tested crack for Perry, purchased baking soda and baggies for Perry, and disposed of Perry's kilogram wrappers in a nearby dumpster. ROA.1813-1814, 1816-1817, 1913. During his frequent visits to the Evergreen click house, Allen saw Chapman and Boyer retrieve and weigh drugs for Perry and handle sales when Perry was not there. ROA.1813, 1822-1823, 1912. According to Allen, Perry's brother Wayne picked up and stored guns that were traded for dope. ROA.1838-1839.

Dalton, Perry's cousin, testified that he first taught Perry to cook crack. ROA.2360. He explained that Chapman, Boyer, Williams, Jonathan Johnson, Joshua, and Shaquille handled drug sales for Perry.

ROA.2375, 2377, 2456, 2502. Additionally, Chapman and Boyer retrieved dope for Perry, disposed of kilogram wrappers, and hid guns. ROA.2379, 2399, 2454-2455. According to Dalton, utilities for the Evergreen house were kept in Chapman's name but the bills were supposed to be given to Perry for payment. ROA.2373.

Jonathan Johnson testified about Perry's operation out of the Louisiana Avenue click house. He was at the house almost every day and assisted Perry by purchasing supplies and retrieving drugs from across the street at the Evergreen house. ROA.2650-2651, 2663, 2698. He also accompanied Perry and Chapman on trips to Houston. ROA.3193-3194. He testified that, when Perry was not at the Louisiana Avenue click house, Chapman and Shaquille took care of customers. ROA.2664-2665, 2715.

Perry's brother Wayne admitted that he and several others went to the store to purchase supplies for Perry. ROA.2950-2951, 3058. He testified that Chapman retrieved drugs, bagged up crack, and conducted sales, and that Boyer cleaned up crack residue in the kitchen, bagged up dope, and disposed of wrappers. ROA.2941, 2946, 2968, 2974, 2992, 3154, 3159. He explained that Chapman, Jonathan

Johnson, Joshua, and Franklin accompanied Perry on trips to Houston. ROA.3016, 3018. He also noted that Perry and their brother Jonathan were arrested on one trip to Houston. ROA.3019.

Franklin regularly bought crack from Chapman at the Evergreen click house. ROA.3267, 3273. He testified that Boyer protected the dope at the Evergreen house and did whatever Perry told him to do. ROA.3308. Franklin later bought his crack from Perry at the Louisiana Avenue house. ROA.3279. He testified that Chapman, Jonathan Johnson, or Joshua retrieved the drugs from the Evergreen house. ROA.3282. Jonathan Johnson or Joshua weighed out the crack and gave it to Franklin, but Franklin paid Perry. ROA.3280-3281. Franklin also testified that, at Chapman's request, he made three trips to Houston with Perry and Chapman. ROA.3280, 3283, 3290, 3293.

As the following examples illustrate, other evidence corroborates the cooperators' testimony and rebuts the suggestion that Perry worked alone. Undercover recordings and police officer testimony regarding Perry's attempted purchase of cocaine from Miami establish that Frank brokered the deal for Perry and that Wayne assisted Perry by driving up in Perry's car and directing Miami to Perry. ROA.1095-1096, 1557-

1558, 1565-1566; U.S. Exs. 1A-1J.  Entergy records reflect that the utilities for the Evergreen click house were in Boyer's name and later Chapman's name.  U.S. Exs. 1AA1-1AA2.  The testimony of Sergeant Donald Dean Nance establishes that Perry and his brother Jonathan were stopped en route to Houston on September 15, 2010, with $71,000 in cash in a secret compartment.  ROA.2308-2320.  Video from a gas station in Houston shows Perry, Chapman, Jonathan Johnson, and Franklin on their last trip to Houston on September 18, 2011.  U.S. Exs. 17DD1-17DD7.  Video from a BRPD dash camera depicts the stop of Chapman and Franklin later that day in Baton Rouge which led to the discovery of two kilograms of cocaine in a hidden compartment.  U.S. Exs. 17-1, 17-2, 17-3, 17-4.  Perhaps most compelling, the videos of the Knight controlled buys in July 2011, provide an inside look at several members of Perry's inner circle at the Louisiana Avenue click house, including Jonathan Johnson, Joshua, and Shaquille.  U.S. Exs. 13A-13A1, 15A1-15A7.

In sum, the evidence plainly demonstrates that Perry's drug operation was a joint endeavor with numerous participants.

2.     **Boyer**

Boyer argues that there was insufficient evidence to prove that he "participated in a conspiracy as an active member" or that he had specific intent.[13]  Boyer's Br. at 12, 19.  He acknowledges that credibility is a jury issue but, at the same time, asks this Court to disregard the testimony of the cooperating witnesses.  Id. at 12-13, 19.  He conveniently ignores much of the evidence of his participation in the conspiracy, acknowledging only that he cleaned crack residue in the kitchen, occasionally ran errands for Perry, and bought and sold drugs "on his own."  Boyer's Br. at 11, 19-20.  The evidence, however, established much more than that and was more than sufficient to establish Boyer's guilt.

Viewed in the light most favorable to the prosecution, the testimony of the cooperators established the following.  Boyer lived at the Evergreen click house and was always there.  ROA.1682, 1812,

---

[13]  Boyer argues separately that there was insufficient evidence to support his conviction (Issue 2) and that the court erred in denying his motions for acquittal at the close of the Government's case and at the conclusion of the trial (Issue 3).  A motion for judgment of acquittal is a challenge to the sufficiency of the evidence in the trial court.  It preserves the issue for appeal.  Because there is no meaningful difference between Boyer's Issue 2 and Issue 3, the United States treats the issues as a single assignment of error.  See Wise, 221 F.3d at 154 (motion for judgment of acquittal is a challenge to the sufficiency of the evidence and is reviewed *de novo* on appeal).

1953, 2019, 2374, 3308.  For a time, he maintained the utilities in his name.  ROA.2147-2148; U.S. Ex. 1AA1.  He served as the "guardian" of the dope at the Evergreen house and did whatever Perry told him to do.  ROA.1611, 3308.  Once, when several ounces of crack were missing, Perry held Boyer and Chapman responsible, beating them both.  ROA.1910-1911, 2493, 2951.  Boyer assisted Perry by buying supplies, disposing of kilogram wrappers, retrieving dope, weighing and bagging dope, cleaning up after Perry cooked crack, and handling customers.  ROA.1611, 1682, 1813, 1816-1817, 1822-1823, 1912, 2369, 2375, 2378-2379, 2411, 2452-2455, 2941, 2950, 2974, 3154, 3271.  He hid guns for Perry in The Warehouse, helped Perry rob the Chinese man, and provided Allen with a gun to rob Johnson.[14]  ROA.1834, 1847, 1956, 2399, 2980.  To put it mildly, "[t]here is evidence that [Boyer] knew of the unlawful purpose of the conspiracy, and acted in concert with the other members of the conspiracy to carry it out."  United States v. Simpson, 741 F.3d 539, 550 (5th Cir. 2014).  That is all that is necessary to establish Boyer's guilt.

---

[14] Boyer was acquitted of the counts related to the robbery of Johnson (Counts 5 and 6).  The acquittals, however, have no bearing in determining the sufficiency of the evidence on the conspiracy count.  See United States v. Powell, 469 U.S. 57, 67 (1984).  The facts related to the robbery are therefore properly considered in evaluating the sufficiency of the evidence against Boyer.

Boyer seems to suggest that his actions furthering the conspiracy were too insubstantial to support a conviction. He argues that there was no evidence that he was "anything more than an occasional errand boy for the Perrys." Boyer's Br. at 20. But, as explained above, liability for participation in a conspiracy is not limited to those who play major roles. *Any* intentional participation in a conspiracy is enough. <u>See, e.g.,</u> <u>Ocasio</u>, 136 S.Ct. at 1430 (serving as a lookout, driving a getaway car, or storing drugs); <u>United States v. Garcia</u>, 567 F.3d 721, 732 (5th Cir. 2009) (acting as a lookout); <u>United States v. Morris</u>, 46 F.3d 410, 421 (5th Cir. 1995) (dropping off payment, picking up cocaine, allowing home to be used to store cocaine); <u>United States v. Crain</u>, 33 F.3d 480, 486 (5th Cir. 1994) (accompanying drug dealer on drug run and taking a turn driving). In any event, Boyer's role in the conspiracy was significant. In particular, Boyer's retrieval of drugs, his weighing and bagging of drugs, and his handling of drug sales in Perry's absence render him a major player in Perry's organization.

Boyer also disputes that the evidence demonstrated specific intent. Boyer's Br. at 18-20. The intent element of conspiracy requires that the prosecution prove that the defendant intended that the object

crime be committed.  Ocasio, 136 S.Ct. at 1429.  Thus, in this case, the

United States was required to prove that Boyer intended that cocaine

and crack be distributed and possessed with the intent to distribute.

Because Boyer himself distributed drugs, it is difficult to imagine how

he could have lacked the necessary intent to distribute drugs.

Additionally, because Boyer took many, many actions which naturally

furthered the conspiracy, the jury was entitled to infer that Boyer's

intent was, in fact, to further the conspiracy.

## II.    The district court did not abuse its discretion in declining to grant Boyer a separate trial from his co-conspirators, and Boyer has not demonstrated that he was prejudiced by the joint trial.

### A.    Standard of Review

Denial of a motion for severance is reviewed for abuse of

discretion.  United States v. Snarr, 704 F.3d 368, 396 (5th Cir. 2013).

The review is "exceedingly deferential."  United States v. Whitfield, 590

F.3d 325, 355 (5th Cir. 2009) (quoting United States v. Tarango, 396

F.3d 666, 673 (5th Cir. 2005)).   To demonstrate an abuse of discretion,

the defendant must show "specific and compelling prejudice" that

resulted in an unfair trial.  United States v. McRae, 702 F.3d 806, 822

(5th Cir. 2012) (citations omitted).  It is not enough for the defendant to

make a general claim of prejudice.  <u>Snarr</u>, 704 F.3d at 396.  Instead, the defendant must meticulously "isolate events occurring in the course of a joint trial and then . . . demonstrate that such events caused substantial prejudice."  <u>United States v. Ellender</u>, 947 F.2d 748, 755 (5th Cir. 1991).

This Court will consider acquittals on some counts and acquittals of co-defendants as demonstrating that the jury was able to "parse the evidence and consider it separately for each defendant and each count." <u>United States v. Valdez</u>, 453 F.3d 252, 262 (5th Cir. 2006).

## B.    Law Regarding Joint Trials

There is "a preference in the federal system for joint trials of defendants who are indicted together."  <u>Zafiro v. United States</u>, 506 U.S. 534, 536 (1993).  Joint trials "conserve [public] funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial."  <u>Bruton v. United States</u>, 391 U.S. 123, 133 (1968).  It is therefore "[t]he rule, rather than the exception" that persons "indicted together should be tried together, especially in conspiracy cases."  <u>United States v. Pofahl</u>, 990 F.2d 1456, 1483 (5th Cir. 1993).

Rule 14, Fed. R. Crim. P., provides that a court "may" order separate trials of properly joined defendants, if a defendant is prejudiced by a joinder.  As noted by the Supreme Court, "Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." <u>Zafiro</u>, 506 U.S. at 538-539.  Cautionary instructions are "generally sufficient" to minimize the risk of prejudice from a joint trial. <u>Whitfield</u>, 590 F.3d at 356 (quotation marks and citation omitted).  A severance is justified "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." <u>Zafiro</u>, 506 U.S. at 539.

A defendant is not entitled to a severance merely because he may have a better chance of acquittal in a separate trial.  <u>Id</u>. at 540.  Thus, "[a] spillover effect, by itself, is an insufficient predicate for a motion to sever." <u>Snarr</u>, 704 F.3d at 397 (quoting <u>United States v. Bieganowski</u>, 313 F.3d 264, 287 (5th Cir. 2002)).

## C.    Discussion

Boyer argues that the district court abused its discretion in

denying his motion for severance.  He contends that he was unfairly

prejudiced by introduction at trial of evidence that had "nothing to do

with" him.  Boyer's Br. at 14.  He acknowledges that the jury acquitted

him of the carjacking and firearms charges arising out of the Johnson

robbery and that the jury "readily parsed out" the evidence regarding

those charges.  Id. at 16.  He insists, however, that "the endless litany of

unrelated traffic stops and searches clearly overwhelmed [the jury's]

senses" and prevented the jury from separating the evidence regarding

the more "nebulous" conspiracy charge.  Id.

Boyer has failed to demonstrate specific and compelling prejudice.

A mere allegation of prejudicial spillover does not establish an abuse of

discretion.  See United States v. Stalnaker, 571 F.3d 428, 435 (5th Cir.

2009) (no abuse of discretion where defendants complained of the

volume of the evidence, disparity of the evidence between defendants,

and prejudicial spillover without pointing to specific prejudice);

Ellender, 947 F.2d at 755 (no abuse of discretion where appellants were

tried for a drug conspiracy along with 21 co-defendants in a three -

month trial).  In fact, because all of the charges against all of the

defendants were related to the conspiracy, virtually all, if not all, of the

evidence presented at the joint trial would have been admissible in a

separate trial of Boyer.  See United States v. Sepulveda, 710 F.2d 188,

189 (5th Cir. 1983) ("proof of the existence of the charged conspiracy is

not confined to the acts of the defendants on trial").

Notably, the district court instructed the jury to consider the

charges against each defendant separately.  ROA.3653.  And the jury

apparently followed those instructions.  While Perry was convicted of

Counts 5 and 6 related to the Johnson robbery, Boyer was acquitted of

those counts.  And, despite the evidence related to other defendants, the

jury acquitted Williams of the conspiracy.  There is simply no reason to

believe that Boyer was prejudiced by a joint trial.

## III.  The district court did not abuse its discretion in denying the motions for new trial filed by Chapman and Boyer.

### A.    Standard of Review

This Court reviews a district court's denial of a motion for new

trial for "clear abuse of discretion."  United States v. Reagan, 725 F.3d

471, 481 (5th Cir. 2013) (citations omitted).  Refusal to conduct an

evidentiary hearing is likewise reviewed for abuse of discretion.  United

States v. Mahmood, 820 F.3d 177, 190, (5th Cir. 2016). In applying the abuse of discretion standard, the Court reviews issues of law *de novo* and issues of fact for clear error. United States v. Pratt, 807 F.3d 641, 645 (5th Cir. 2015). The standard of review "is necessarily deferential to the trial court because the appellate court has only read the record and, unlike the trial court, did not see the impact of witnesses on the jury or observe the demeanor of witnesses." United States v. Wall, 389 F.3d 457, 465 (5th Cir. 2004). Thus, this Court will "not revisit evidence, reevaluate witness credibility, or attempt to reconcile seemingly contradictory evidence." Tarango, 396 F.3d at 672.

## B.    Rule 33

Rule 33(a) of the Federal Rules of Criminal Procedure provides that the court may order a new trial on motion of the defendant "if the interest of justice so requires." The interest of justice may warrant a new trial, among other reasons, when the verdict is against the weight of the evidence or when the defendant discovers new evidence. See Wall, 389 F.3d at 466; Robertson, 110 F.3d at 1118. Except in extraordinary circumstances, the defendant must demonstrate a miscarriage of justice resulting in actual prejudice. See United States

v. Bowen, 799 F.3d 336, 355 (5th Cir. 2015); Wall, 389 F.3d at 466.  This Court has explained that "motions for new trial are not favored, and are granted only with great caution."  United States v. O'Keefe, 128 F.3d 885, 898 (5th Cir. 1997).

In determining whether the verdict is against the weight of the evidence, the district court "may weigh the evidence and assess the credibility of the witnesses."  United States v. Munoz, 150 F.3d 401, 413 (5th Cir. 1998).  However, the court should not "set aside the verdict simply because it feels some other result would be more reasonable."  Robertson, 110 F.3d at 1118.  Rather, a new trial should be granted only if the evidence "preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand."  Id.  Notably, "it is not the role of the judge to sit as a thirteenth member of the jury."  O'Keefe, 128 F.3d at 898.

To obtain a new trial based on newly discovered evidence, the defendant must establish the following prerequisites (referred to as the Berry factors):

> (1) the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) the failure to detect the evidence was not due to a lack of due diligence by the defendant; (3) the

> evidence is not merely cumulative or impeaching;
> (4) the evidence is material; and (5) the evidence
> if introduced at a new trial would probably
> produce an acquittal.

<u>Wall</u>, 389 F.3d at 467.  Unless the defendant satisfies all five elements, the motion for new trial should be denied.  <u>Id</u>.

Ordinarily, a motion for new trial does not require a hearing. <u>Mahmood</u>, 820 F.3d at 190.  The court can make its decision based on affidavits rather than live testimony.  <u>Id</u>.  A hearing is required only in "unique situations," such as cases involving "allegations of jury tampering, prosecutorial misconduct, or third party confession."  <u>Id</u>.

## C.    Discussion

### 1.    Boyer

Boyer asserts that the district court abused its discretion in denying his motion for new trial.  He maintains that a new trial should have been granted for two reasons: (1) he was prejudiced by the spillover effect of evidence concerning his co-defendants; and (2) the verdict is against the weight of the evidence.  Boyer's Br. at 23.

Boyer's complaint about prejudicial spillover is essentially a re-statement of his objection to the denial of his pre-trial motion to sever.

As discussed above, Boyer has failed to demonstrate compelling prejudice from the joint trial. As a result, the district court did not err in declining to grant a new trial on this basis.

Boyer's argument that the verdict was against the weight of the evidence is devoid of any meaningful analysis. His discussion of the evidence consists of a mere two sentences, both of which are conclusory:

> There was no evidence presented that Mr. Boyer knew the scope of Mr. Perry's operation, no evidence that he participated on interstate drug runs, set prices, directed purchases, or any other indicia of control. As noted previously, the indications of intent to join or assist the conspiracy, for anything other than payment in crack cocaine, was lacking, and therein lies the injustice to be corrected.

Boyer's Br. at 23. Those complaints are without merit. It is not necessary that a conspirator know the full scope of the conspiracy, play a controlling role rather than a supporting role, or be motivated by something other than payment in crack. See Brown, 727 F.3d at 339 (conspirator need not know details of conspiracy or identity of all of the co-conspirators); Salinas, 522 U.S. at 64 ("the supporters are as guilty as the perpetrators"); Holmes, 406 F.3d at 353 (prosecution need not prove a defendant's motive or subjective intent). As discussed above,

66

there was ample evidence of Boyer's participation in the conspiracy. Although the district court recognized that it had the authority to assess credibility and re-weigh the evidence, it found that the verdict was supported by the evidence.  ROA.7101.  Boyer has provided no basis for this Court to conclude that the district court abused its discretion in so finding.[15]

### 2.   Chapman

Chapman challenges the district court's denial of his motion for a new trial on Count 10, which charged Perry and Chapman with possession of firearms—the guns found under the sink at the Evergreen house—in furtherance of drug trafficking activity, in violation of 18 U.S.C. § 924(c).  Specifically, Count 10 charged that the firearms were possessed in furtherance of Count 1 (the conspiracy) and Count 9 (possession of the drugs seized at the Evergreen house along with the

---

[15]  Boyer complains that Judge Dick, who began presiding over the trial after Judge Brady was hospitalized, was unable to assess credibility because she did not see the testimony of many of the prosecution's witnesses.  Boyer's Br. at 23.  At the same time, he seeks relief from this Court—which can do no more than review the "cold record."  Id. at 23.  While Judge Dick did not see many of the witnesses, she saw 17 witnesses, including Wayne and Franklin; she listened to the recorded testimony of others; and she was able to observe the jury's reaction to witnesses and argument of counsel.  Her assessment of the weight of the evidence is therefore entitled to great deference.

guns).  Chapman contends that, because West claimed responsibility for the guns, a new trial was warranted.

The district court properly denied the motion.  The motion failed to satisfy four of the required five elements for a new trial based on newly discovered evidence.  Although the district court based its decision only on the failure to establish that the new evidence would probably result in an acquittal, this Court can affirm on any basis supported by the record.  See United States v. Chacon, 742 F.3d 219, 220 (5th Cir. 2014); United States v. Causey, No. 11-31106, 568 Fed.Appx. 269, 277 (5th Cir. May 13, 2014) (unpublished) (regarding motion for new trial).

First, Chapman merely adopted Perry's motion and did not even bother to allege that West's information was new to him.  While Perry alleged that he learned of West's information after trial, there is nothing in the record to establish that Chapman learned of the information after trial.  At best, new discovery of the information might be inferred from Chapman's assertion that he was "situated procedurally similar[ly] to his co-defendant" and "the reasons set forth in his co-defendant's motion also appl[ied] to him."  ROA.746.  Even so,

the supporting declaration by Perry's attorney does not include *any*

information as to when the "new" information was obtained from West.

In the end, an unsupported allegation by Perry that the information

was discovered by him after trial does not satisfy Chapman's burden of

proving that the evidence was unknown to Chapman at the time of

trial.

Second, neither Chapman nor Perry established—or even

alleged—due diligence.  As set out in the Government's opposition, both

Chapman and Perry were given the reports regarding seizure of the

guns long before trial.  ROA.755.  The reports identified West and

described his statements to police.  ROA.807, 820.  Additionally,

because Chapman and Perry were both arrested by BRPD for

possession of the guns, it is reasonable to believe that they were aware

of West's potential as a witness well before receiving discovery from the

United States.  See ROA.825, 829.  In fact, when Perry was arrested on

the state charges in late 2010, he was represented by the very same

attorney who represented him at the trial of this case almost four years

later.  See ROA.829.  Yet Chapman and Perry have offered no

explanation, much less proof, for their asserted failure to discover

West's information prior to trial.

Third, Chapman did not establish that the supposedly new evidence was material. Neither Chapman nor Perry submitted an affidavit or declaration by West himself. Instead, Perry filed a declaration by his own attorney regarding statements made by West to the attorney. This Court has squarely held that such inadmissible hearsay is not material for purposes of granting a new trial. See Wall, 389 F.3d at 470-471 (district court erred in relying on a "representation from defense counsel repeating statements that [the witness] made to counsel").

Fourth, West's information was not "so compelling" that it would probably result in Chapman's acquittal if introduced at a new trial. See United States v. Gonzalez, 163 F.3d 255, 264 (5th Cir. 1998). To establish Chapman's guilt, the United States was required to prove that the firearms were possessed by Chapman in furtherance of the specified drug crimes. Possession, of course, can be actual or constructive, sole or joint. United States v. McKnight, 953 F.2d 898, 901-902 (5th Cir. 1992). Possession of a firearm is in furtherance of drug trafficking if it "furthers, advances, or helps forward the drug trafficking offense."

United States v. Ceballos-Torres, 218 F.3d 409, 415 (5th Cir. 2000).

The following factors are relevant in determining whether possession is

in furtherance of a drug trafficking crime:

> the type of drug activity that is being conducted,
> accessibility of the firearm, the type of the
> weapon, whether the weapon is stolen, the status
> of the possession (legitimate or illegal), whether
> the gun is loaded, and the time and
> circumstances under which the gun is found.

Id. at 414-415.  Notably, the United States was not required to prove

that Chapman personally possessed the guns.  Under the Pinkerton

doctrine, it is sufficient if the United States proved possession of the

guns by one of Chapman's co-conspirators in furtherance of the

conspiracy.  Pinkerton, 328 U.S. 640.

The information from West does not relate at all to Chapman's

knowledge or possession of the firearms.  The supporting declaration by

Perry's counsel—the only evidence offered by either movant—does not

represent that *Chapman* was unaware of West's storage of the guns; it

represents only that Perry was unaware.  Evidence that Perry was

unaware of the guns would not establish that Chapman was unaware of

the guns, particularly because the evidence established that Chapman

himself used the compartment under the sink.  West's evidence is

71

therefore of limited value to Chapman.

Moreover, as the district court found, West's story is incredible: "[i]t strains credulity to suggest that West snuck into this 'click' house and, unbeknownst to Perry or Chapman who operated out of the location, hid weapons in a secret compartment, under a false bottom inside a cabinet." ROA.852. In other words, even if West were to testify at a new trial that he hid the guns under the sink, the jury would likely conclude that Chapman and Perry knew the guns were there—and therefore constructively possessed them. That conclusion is supported by Wayne's testimony that he had seen someone with the .40 caliber pistol at the Evergreen house. ROA.2985-2986. Given that Perry's co-conspirator brother had seen one of the guns at the click house, West's assurance that Perry himself had no knowledge of the guns would carry little weight.

Additionally, the district court rightly concluded that West's account itself suggests that West was a co-conspirator and that Perry and Chapman were therefore guilty under the Pinkerton theory. ROA.853. The compartment in which the guns were found was concealed—even Wayne was unaware of its existence. ROA.2997.

Surely, West could not have known of the secret compartment and felt free to use it unless he was a trusted associate. Chapman admits as much: his brief acknowledges that West's statements "reasonably raise the inference[s] that West was aware of Perry's activities and that Perry trusted West enough to grant him free access to the Evergreen Street house." Chapman's Br. at 9.

Chapman argues, however, that, if West were to testify at a new trial and be believed by the jury, there would be insufficient evidence to support <u>Pinkerton</u> liability. Specifically, he contends that West's close association with Perry and his knowledge of Perry's drug activity could not alone establish West's participation in the conspiracy. Chapman's Br. at 9-10. Additionally, he maintains that the jury "could not simultaneously believe [West's] allegations [that he stored the guns with intent to sell them] and conclude that he possessed the guns in furtherance of a drug-trafficking crime." Chapman's Br. at 6.

For a number of reasons, Chapman's argument is unconvincing. In the first place, there is no reason to believe that a jury would find West's account to be credible. As noted above, the district court—after considering all of the evidence presented at trial—found that West's

73

version of events "strains credulity." Thus, Chapman's argument rests on the unlikely premise that West would be believed.

Additionally, if West were to testify that he used the spot under the sink to store guns without Perry's knowledge, the jury would indeed have ample evidence to find that West was a co-conspirator. As Chapman concedes, West's knowledge and use of a hidden compartment in the click house would be sufficient to establish that West was a trusted associate with knowledge of Perry's drug dealing. As this Court has held, "presence and association with other members of a conspiracy, when supported by other evidence, may be used to support the finding of a conspiracy." United States v. Misher, 99 F.3d 664, 668 (5th Cir. 1996). Here, the "other evidence" is that West stored guns—tools used in Perry's drug trade—in a secret compartment dedicated to concealing Perry's drugs and that he had apparent authority to do so without Perry's knowledge. That is more than the "slight evidence" needed to connect West to the conspiracy. See Krenning, 93 F.3d at 1265 (citations omitted).

Likewise, even if the jury at a new trial were to believe that West intended to sell the guns, it would have plenty of evidence to support a

finding that the guns were nevertheless possessed in furtherance of drug trafficking. The intent to sell the guns and the intent to further drug trafficking are not mutually exclusive: during whatever time the guns were stored pending sale, they were available for use in Perry's drug operation.

The trial jury concluded—without knowing who put the guns under the sink—that the guns were possessed in furtherance of drug trafficking. That conclusion was supported by substantial circumstantial evidence: the guns were found in a click house in a secret compartment designed for storing drugs; the click house was operated by a convicted felon who was prohibited from possessing firearms; a substantial amount of drugs was found in the house at the same time; the guns were loaded; they were handguns; they were in close proximity to drug trafficking paraphernalia in the kitchen; they were easily accessible; and members of the conspiracy in fact used guns for protection and for robbing other drug dealers. See, e.g., United States v. Walker, ___ F.3d ___, 2016 WL 3648323 (5th Cir. 2016); United States v. Charles, 469 F.3d 402 (5th Cir. 2006); Ceballos-Torres, 218 F.3d 409. In the end, the very same evidence would support a finding

that the guns were possessed in furtherance of drug trafficking even if West were to testify at a new trial and be judged credible.

Finally, Chapman contends, with no support and virtually no argument, that the district court should have held an evidentiary hearing before denying the motion. Chapman's Br. at 11-12. The general rule, however, is that a district court need not conduct a hearing on a motion for new trial. Chapman fails to explain why this case should be the exception.

Perry's motion, which Chapman adopted, requested an evidentiary hearing but did not identify what Perry intended to prove at a hearing. Perry's reply brief, which Chapman did not adopt, suggested that West would be called to testify at the hearing "to resolve major evidentiary issues." ROA.846. Perry did not represent that West was willing to waive his Fifth Amendment privilege and testify, and he did not identify what specific facts he would elicit from West beyond those reflected in the supporting declaration. Additionally, neither Chapman nor Perry submitted proof that West's information was newly discovered or that they had exercised due diligence. See United States v. Brewer, 60 F.3d 1142, 1145-1146 (5th Cir. 1995) (defendant not

entitled to hearing on motion for new trial where he "failed to prove that his 'new evidence' . . . was in fact newly discovered and that its recent discovery was in no way attributable to a previous lack of diligence").  Under the circumstances, the district court was well within its discretion in declining to conduct a hearing.

## CROSS-APPEAL

**IV.  The district court erred when it failed to impose the mandatory enhanced penalty for either of Perry's convictions for violating 18 U.S.C. § 924(c).**

### A.    Standard of Review

The interpretation of a criminal statute is a legal issue which is reviewed *de novo*.  United States v. Kaluza, 780 F.3d 647, 653 (5th Cir. 2015).

### B.    Enhanced Penalties Under Section 924(c)

The mandatory minimum penalty for a first conviction under 18 U.S.C. § 924(c) is ordinarily five years.  18 U.S.C. § 924(c)(1)(A)(i).  If the firearm was brandished, the mandatory minimum term of imprisonment is seven years.  18 U.S.C. § 924(c)(1)(A)(ii).  If the firearm was discharged, the mandatory minimum is ten years.  18 U.S.C. § 924(c)(1)(A)(iii).  For a "second or subsequent conviction," the

mandatory minimum is 25 years, without regard to whether the firearm

was discharged, brandished or merely possessed.  18 U.S.C.

§ 924(c)(1)(C)(i).  Any sentence under Section 924(c) must be

consecutive to any other sentence.  18 U.S.C. § 924(c)(1)(D)(2).

In <u>Deal v. United States</u>, 508 U.S. 129 (1993), the Supreme Court

held that the enhanced penalty for a second or subsequent conviction

applies when a defendant is convicted of multiple 924(c) counts in a

single proceeding.  Defendant Deal was convicted at a single trial of six

counts of carrying and using[16] a firearm during and in relation to a

crime of violence (bank robbery) in violation of 18 U.S.C. § 924(c).  508

U.S. at 130.  The district court sentenced the defendant to five years on

the first 924(c) count and to 20 years[17] on each of the remaining counts.

<u>Id</u>. at 131.  This Court affirmed.  <u>Id</u>.  In the Supreme Court, the

defendant argued that the word "conviction" in the statute refers to

entry of final judgment on the jury's verdict.  <u>Id</u>.  The defendant

maintained that, because the district court entered but a single

---

[16] At the time of Deal's offenses, Section 924(c) provided a five-year mandatory term of imprisonment for a first conviction.  <u>See</u> 18 U.S.C. § 924(c)(1) (1990).  The statute did not provide for increased penalties for brandishing or discharge.  <u>Id</u>.

[17] The statute has since been amended to prescribe an enhanced penalty of 25 years, rather than 20 years, for second and subsequent convictions.  <u>See</u> 18 U.S.C. § 924(c)(1)(C)(i).

judgment, there was no second or subsequent conviction which qualified for the enhanced penalty. The Supreme Court rejected that view and held that the word "'conviction' refers to the finding of guilt by a judge or jury that necessarily precedes the entry of a final judgment of conviction." Id. at 132.

## C.   Discussion

The district court's decision not to impose the enhanced penalty for a second conviction on either of Perry's 924(c) convictions was error. Deal held that each jury finding of guilt is a conviction under the statute and that "findings of guilt on several counts are necessarily arrived at successively in time." Id. at 133 n.1. So, under Deal, the jury's verdict as to Perry necessarily included a first 924(c) conviction and a second 924(c) conviction. Under the statute, the penalty for a second conviction is a minimum of 25 years imprisonment. Because the court did not impose 25 years on either of Perry's 924(c) convictions, Perry's sentence is illegally lenient.

The district court explained that, because it was unable to determine which of the jury's findings of guilt came first, it applied the rule of lenity. The order of the convictions matters in this case because

the two counts carry different penalties for a first conviction. If the

possession conviction was first, Perry is subject to a five-year

mandatory minimum plus a 25-year mandatory minimum on the second

conviction. If the discharge conviction was first, Perry is subject to a

ten-year mandatory minimum plus the 25-year penalty for the second

conviction.

The rule of lenity provides that an ambiguous criminal statute

should be construed in favor of the defendant. <u>Kaluza</u>, 780 F.3d at 669.

But, the district court did not merely interpret Section 924(c) in favor of

the defendant. Rather, it simply decided not to impose the 25-year

penalty at all. That is not lenient application of the statute; it is no

application of the statute.

The court indicated that it was persuaded not to apply the

enhanced penalty by the Ninth Circuit's decision in <u>United States v.

Major</u>, 676 F.3d 803 (9th Cir. 2012). In <u>Major</u>, where the defendants

were convicted of multiple discharge and brandishing counts, the Ninth

Circuit noted, like the district court here, that it could not determine

the order of the jury's findings of guilt. <u>Id</u>. at 814. The court reasoned

that, because Section 924(c) was "ambiguous as to how . . . convictions

should be ordered when verdicts on multiple counts are returned at the same time," the rule of lenity should be applied. Id. at 814. Unlike the district court in this case, the Major court did not hold that the enhanced penalty had no application. Instead, the court concluded that the district court should have used one of the brandishing counts as the first conviction in order to minimize the mandatory penalty. Id.

Neither this Court nor the Supreme Court has addressed the issue of how a sentencing court should determine which of several 924(c) guilty verdicts in a single trial qualifies as the first conviction. The only circuits to have reached the issue—the Second, Sixth, and Ninth—have held that, under the rule of lenity, a sentencing court should designate a count having the lowest mandatory minimum as the first conviction. See United States v. Pierce, 785 F.3d 832 (2d Cir. 2015); United States v. Washington, 714 F.3d 962 (6th Cir. 2013); Major, 676 F.3d 803. That is a reasonable approach. To treat both convictions as first convictions, as the district court did, is contrary to Deal and the statute.

81

# CONCLUSION

For the foregoing reasons, appellants' convictions should be affirmed, and Perry's sentence should be vacated and his case remanded for re-sentencing with instructions to the district court to impose a 25-year sentence on Count 6.

Respectfully submitted,

J. WALTER GREEN
United States Attorney
Middle District of Louisiana


/s/ M. Patricia Jones
M. PATRICIA JONES, LBN 18543
ROBERT PIEDRAHITA, LBN 10989
Assistant United States Attorneys
777 Florida Street, Suite 208
Baton Rouge, Louisiana 70801
Telephone: (225)389-0443

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Brief of the United States was filed via the Court's electronic filing system, and was served on counsel for the defendants via the Court's electronic notification system.  Two paper copies will also be mailed to counsel addressed as follows:

      Mr. Christopher A. Aberle
      Attorney at Law
      P.O. Box 8583
      Mandeville, LA 70470-8583

      Mr. Joseph K. Scott, III
      Attorney At Law, LLC
      830 Main Street
      Baton Rouge, LA 70802

      Mr. Michael Sean Walsh
      Taylor, Porter, Brooks & Phillips L.L.P.
      Post Office Box 2471
      Baton Rouge, LA 70821-2471

DATE: August 29, 2016

                       /s/ M. Patricia Jones
                       M. PATRICIA JONES
                       Assistant U.S. Attorney

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

   a. this brief contains 15,631 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   a. this brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in Century Schoolbook 14 pt.

DATE: August 29, 2016.

/s/ M. Patricia Jones
M. PATRICIA JONES
Assistant U.S. Attorney